Page 1

1                          UNITED STATES BANKRUPTCY COURT
                           SOUTHERN DISTRICT OF FLORIDA
2
                           Judge Laurel Myerson Isicoff
3
4     IN RE:
                                     )
5     BANKUNITED FINANCIAL     ) CASE NO: 09-19940-BKC-LMI
      CORPORATION,                   )
6            Debtor.                 )
      _____ )
7
8
9            EMERGENCY MOTION TO APPROVE EMERGENCY MOTION
             FOR ENTRY OF AN ORDER AUTHORIZING THE USE OF
10           ESTATE PROPERTY TO PURCHASE DIRECTOR AND
             OFFICER LIABILITY INSURANCE POLICIES FILED
11           BY DEBTOR BANKUNITED FINANCIAL CORPORATION,
             INTERESTED PARTIES BANK UNITED FINANCIAL
12              SERVICES, INCORPORATED, CRE AMERICA
                        CORPORATION (350)
13
14
                        NOVEMBER 9th, 2009
15
16           The above-entitled cause came on for hearing
17    before the HONORABLE LAUREL M. ISICOFF, one of the
18    judges in the UNITED STATES BANKRUPTCY COURT, in and
19    for the SOUTHERN DISTRICT OF FLORIDA AT LARGE, at 51
20    SW 1st Avenue, Miami, Dade County, Florida, commencing
21    at or about 11:30 a.m., on November 9th, 2009, and the
22    following proceedings were had:
23
24
25                   Reported by: Carmen E. De La Cruz

Page 2

1    APPEARANCES:

2

3    GREENBERG TRAURIG

4    BY:  MARK D. BLOOM, ESQ.,

5         BRIAN FRIEL, ESQ., (VIA TELEPHONE)

6    on behalf of the Debtor.

7

8    KOZYAK, TROPIN & THROCKMORTON

9    BY:  CORALI LOPEZ-CASTRO, ESQ.

10   On behalf of the Creditors' Committee.

11

12   MCDERMOTT WILL & EMERY

13   BY:  BRUCE BERMAN, ESQ.

14   On behalf of FDIC.

15

16   STEARNS WEAVER MILLER

17   BY:  CHRISTOPHER PEARSON, ESQ.

18   On behalf of New Bank.

19

20   ALSO PRESENT:

21   JOSEPH LUSINSKY,

22   Chief Restructuring Officer.

23

24

25

1            THE COURT:  All right.  The next matter is

2    BankUnited Financial Corporation.  I believe I have

3    some parties attending by telephone, so I will take

4    telephone appearances from phone parties first.

5            Is anyone on the phone?

6            MR. BLOOM:  Your Honor, it's possible that

7    my colleague Brian Friel from our Washington, D.C.

8    office who is not admitted in this district may be on

9    the phone.  He's an expert in insurance coverage and

10   is here just in case the Court may ask a question to

11   which I don't know the answer or worse, give a wrong

12   answer.

13           THE COURT:  Okay.  All right.  Well,

14   Mr. Friel, are you there?

15           MR. FRIEL:  I am here, Your Honor.

16           THE COURT:  Uh-huh.  Okay.  So Mr. Friel,

17   welcome.  I'll now take appearances from the

18   courtroom.

19           MR. BLOOM:  Good morning, Your Honor.

20   Mark Bloom with Greenburg Traurig on behalf of the

21   debtors, BankUnited Financial Corporation and its

22   affiliates.  Also present is Joseph Lusinsky the chief

23   restructuring officer of the debtors.

24           THE COURT:  Okay.

25           MS. LOPEZ-CASTRO:  Good morning, Your

Page 4

1   Honor.  Cori Lopez-Castro on behalf of the creditors

2   committee.

3          THE COURT:  All right.  Good morning.

4          MR. BERMAN:  Good morning, Your Honor.

5   Bruce Berman of McDermott Will & Emery for FDIC.

6          MR. PEARSON:  Good morning, Your Honor.

7   Christopher Pearson of Stearns Weaver Miller here on

8   behalf of New Bank.

9          THE COURT.  Okay.  All right.  We're here

10  on the emergency motion to approve the debtor's

11  ability to spend $101,000 before midnight; is that

12  correct?

13         MR. BLOOM:  That's pretty much it, Your

14  Honor.  Yes.

15         THE COURT:  Okay.  And I understand

16  committee has an objection.  I've reviewed your

17  motion, Mr. Bloom, but by all means, go ahead and

18  share whatever additional information you'd like to

19  share or anything you'd like to underscore.

20         MR. BLOOM:  Sure.  I'll try and be fairly

21  quick about it.  First, to thank the Court for

22  accommodating us on an emergency basis.  We're here

23  today somewhat reluctantly to seek what we think is

24  authority to engage in an ordinary course transaction

25  to complete this purchase by tonight.

1          This is a transaction that's authorized by

2   Florida statutes, required by the company's bylaws and

3   the U.S. Trustee guidelines, and reflects the

4   reasonable and prudent business judgment of the chief

5   restructuring officer and the board.

6          By way of background, for the one year

7   policy period that ends at one minute after midnight

8   tonight, the debtors have had $30 million in director

9   and officer coverage in place in the form of a $20

10  million primary policy, plus a $10 million excess

11  policy.  The coverage under one or both of those

12  policies has been triggered by a number of pending or

13  threatened claims.  Your Honor is generally familiar

14  with the shareholder class action claim as to which a

15  motion for relief from stay brought by Mr. Nowack was

16  heard and resolved last month.

17          Your Honor, also, I believe has heard a

18  good bit of jockeying for position one might say, as

19  between the FDIC and the creditor's committee in its

20  derivative capacity regarding who has the standing to

21  bring certain types of claims that are not pending,

22  but have been threatened, and certain may have been

23  noticed under those policies --

24          THE COURT:  Uh-huh.

25          MR. BLOOM:  -- and that insurance expires

1  just after midnight tonight.

2            THE COURT:  Okay.

3            MR. BLOOM:  As the expiration approaches,

4  the CRO and the board undertook to procure coverage

5  for the next one year period.  Mr. Lusinsky, the chief

6  restructuring officer, is in court today and if the

7  court will receive it and no one has any objection, I

8  would offer a proffer of his testimony on why we

9  believe this coverage is necessary, and what has been

10 done so far to figure on or to finalize on this

11 particular policy that we're looking to obtain

12 authority to purchase.

13            THE COURT:  All right.  Well, let me poll

14 those present.  Ms. Lopez-Castro, any objection to

15 Mr. Bloom's proffer?

16            MS. LOPEZ-CASTRO:  No.

17            THE COURT:  Okay.  Mr. Berman?

18            MR. BERMAN:  No objection.

19            THE COURT:  All right.  Mr. Pearson?

20            MR. PEARSON:  No objection.

21            THE COURT:  Okay.  All right.  Then go

22 ahead and proffer.

23            MR. BLOOM:  Your Honor, Mr. Lusinsky's

24 proffer if called to the witness stand would be as

25 follows; that in his capacity as chief restructuring

1  officer, he believed that it was necessary and proper

2  to pursue the purchase of further insurance for the

3  one year period beginning tomorrow and concluding

4  November 10th, 2010 for the following reasons:  First,

5  the risk, albeit minimal, of a lawsuit or government

6  investigation based on newly alleged acts, wrongful

7  acts or omissions.  The law -- as to which any lawsuit

8  or investigation including defense costs would be

9  covered by a new policy.

10           Second, the requirement in the ordinary

11  course of business to provide this level of indemnity

12  protection to current officers and members of the

13  board under Florida Statutes, and the company's bylaws

14  that I'll get into in a moment.  Third, the

15  requirement under the U.S. Trustee guidelines for such

16  insurance.  I'll also have more to say about that in a

17  moment.  And fourth, the confirmation did in fact, the

18  DNO insurance market had available within it such

19  coverage to address these needs and requirement on

20  solid terms and conditions, and in competitive

21  pricing.

22           Mr. Lusinsky would also include in his

23  proffer a statement that this is not what is known as

24  tail insurance.  This is not continuing of the

25  existing coverage at existing levels for additional

1  claims that are made within the next year.

2  Mr. Lusinsky would testify that the company initially

3  looked into purchasing such a tail for the existing

4  insurance, but that the premium of $1.4 million was

5  viewed as far too expensive, particularly in light of

6  the fact that claims have already been made or

7  threatened in respect of that policy, and that we

8  believe that -- or in respect of those policies, and

9  we believe that the -- the notoriety that this case

10 has received suggests that all of those claims will or

11 should have been made by the termination under those

12 policies, the expiration of those policies tonight.

13         Mr. Lusinsky will further testify -- would

14 further testify that under his direction the debtor's

15 insurance broker solicited bids for renewal DNO

16 insurance for the one year policy period that begins

17 tomorrow, and received competitive bids from three

18 different underwriters including HCC, or I should say

19 more formally, Houston Casualty Company, which is the

20 incumbent carrier.

21         After reviewing those three bids, the

22 debtor taking the advice -- I'm sorry, Mr. Lusinsky

23 taking the advice of the debtor's insurance broker,

24 would testify that he recommends that the bid

25 presented by HCC represents a combination of the best

1   terms, conditions and pricing, and that is to provide
2   $5 million of limits at a policy premium of $101,000 a
3   year.  HCC and one of the other insurance companies
4   from which bids were solicited also offered reduced
5   limits of $3 million.  HCC was willing to cover those
6   $3 million for a premium of $75,750.  Access required
7   a premium of $100,000 for the coverage in that reduced
8   amount.

9           One of the things Mr. Lusinsky would
10  testify that distinguished and favored the HCC policy
11  is that it has a retrospective date of November 10th,
12  2008.  It was the only one of the three policies that
13  had that retrospective date, and that date means that
14  it will provide coverage for any claim filed against
15  an insured during the next one year, which is based on
16  new allegations of wrongful acts or omissions since
17  November 10th, of 2008, meaning allegations other than
18  the class action lawsuit and other information that
19  was set forth in the insurance application.

20          THE COURT:  So it's like a semi-tail?
21          MR. BLOOM:  I guess we can call it a
22  semi-tail.  Mr. Lusinsky believes on the basis of
23  these facts and conclusions, that the $5 million
24  coverage at the annual premium of $101,000 is in the
25  ordinary course of business and in the best interest

1   of the debtors and the estates.

2           Briefly, Your Honor, there are multiple

3   sources of authority to continue coverage.  First,

4   Florida Statute Section 607.0850 authorizes a Florida

5   corporation to indemnify its directors and officers.

6   Pursuant to that grant of authority, the bylaws of

7   this company expressly provide for indemnification

8   consistent with the scope provided for under Florida

9   statutes.  Section 10.1 of the bylaws provides in

10  mandatory language that BUFC shall indemnify its

11  officers and directors.  Sections 10.3 and 10.4 of the

12  bylaws set forth a procedure for the payment in

13  advance of expenses and defense cost.  Section 10.7 in

14  other mandatory language also provides that the

15  corporation shall purchase and maintain insurance, if

16  such is readily available to the corporation

17  consistent with those provisions in the Florida

18  statute that I've cited.

19          More over, the U.S. Trustee guidelines

20  established, pursuant to 28 USC Section 586(a)(3) as

21  revised on February 1, of 2008, provide in Item 5 that

22  within 15 days of a -- of bankruptcy filing, the

23  debtor must provide the U.S. Trustee with proof of

24  insurance coverage required by the these guidelines.

25  It then goes on to say that upon expiration or

1    termination of any coverage, debtor shall immediately

2    provide the United States Trustee with adequate proof

3    of replacement coverage.  And then it says, debtor

4    shall maintain at least the following coverage where

5    appropriate, and it lists -- Your Honor, we've

6    appended the U.S. Trustee guideline as Exhibit A to

7    the motion.

8                    THE COURT:  I've reviewed it.

9                    MR. BLOOM:  And it lists a number of

10   different types of insurance coverage.  One can make

11   the objective judgment that vehicle coverage, Item

12   5(e) would not be appropriate where a debtor has no

13   vehicles.  That product liability coverage would not

14   be appropriate under 5(f) where the debtor produces no

15   product.  But Item 5(h) talks about directors and

16   officers liability insurance, and Item 5(j) talks

17   about other coverage customary or prudent in the

18   debtor's business.  We believe that it's customary and

19   prudent in this debtor's business as with really any

20   corporation to have coverage like that here, and I'll

21   be quick to point out that the U.S. Trustee has

22   indicated that notwithstanding the guidelines, they

23   will not require that this company provide this

24   insurance.  The U.S. Trustee has indicated that they

25   will not require it.

1   On the other hand, we think that this case

2 requires insurance, maybe even more so, than most

3 cases, and here's the reason why, unlike many

4 companies that walk into this court liened to the hilt

5 or walk out of the court after the first day with no

6 unencumbered assets left available to them, this

7 company has on the order of $16 million unencumbered

8 cash on hand with no super priority claims granted in

9 respect of any DIP financing or any cash collateral

10 use.  The company has consistent with Florida law

11 under its own bylaws and obligation to directors and

12 officers to indemnify them for post-petition acts,

13 ongoing acts.  That indemnification right can lead to

14 administrative claims against the estate in respect of

15 any post-petition acts or omissions, and the last

16 thing that Mr. Lusinsky as CRO or frankly my firm as

17 counsel for the debtor's is going to do here is make a

18 subjective judgment that it's not appropriate or

19 required in this instance because to do that will

20 leave the estates open to the possibility of indemnity

21 claims that would take priority over the entire class

22 of claims of general insurance creditors for which

23 there would be no insurance coverage.

24   We believe the continuing coverage is

25 necessary in particular for those reasons that it's

1  appropriate, it's in the ordinary course, it's

2  reasonable in amount and price based upon a concerted

3  effort to access the  market both terms of coverage

4  and premium, and we'd ask the Court to approve it as a

5  matter of business judgment.  And as Your Honor

6  pointed out, if the fully earned premium is not paid

7  by the end of the day today, then the current coverage

8  will expire, as a result of that the estates would be

9  left unprotected.

10               Again, the debtors and the CRO and their

11  counsel are not going to make the subjective judgment

12  anymore than we'd make a subjective judgment that if

13  we had a warehouse there might not be a fire, so if

14  there is a fire here, we want to make sure this estate

15  is protected and that's why we come to court today in

16  the face of opposition from the committee and the

17  statement by the U.S. Trustee that while they did not

18  want to get involved in the fray, they wanted it clear

19  that they were not requiring us.  They were

20  effectively granting us relief from these guidelines.

21               THE COURT:  Okay.

22               MR. BLOOM:  Thank you, Your Honor.

23               THE COURT:  Well, before I hear from

24  Ms. Lopez-Castro, I first want to ask,

25  Ms. Lopez-Castro did you want to cross-examine

Page 14

1    Mr. Lusinsky on Mr. Bloom's proffer?

2              MS. LOPEZ-CASTRO:  Only -- and I don't

3    think it needs to be a cross-examine, what I wanted to

4    confirm with Mr. Lusinsky is, if the motion is not

5    granted, he's not leaving.  He's not walking out the

6    door tomorrow, and I think that's clear that

7    Mr. Lusinsky we're not in fear of losing Mr. Lusinsky

8    if this motion is not granted today.

9              THE COURT:  Okay.  So I'll ask Mr. Bloom

10   to ask Mr. Lusinsky that or I'll ask Mr. Lusinsky to

11   answer that directly.

12             MR. LUSINSKY:  My employment is not

13   contingent on DNO insurance.

14             THE COURT:  Okay.  Mr. Berman, did you

15   want to cross-examine Mr. Lusinsky?

16             MR. BERMAN:  No, Your Honor.

17             THE COURT:  All right.  Mr. Pearson?

18             MR. PEARSON:  No, Your Honor.

19             THE COURT:  Okay.  Proceed,

20   Ms. Lopez-Castro.

21             MS. LOPEZ-CASTRO:  Your Honor, I do think

22   that the board's business judgment is off in this case

23   meaning it's not sound with respect to this motion.

24   As I just elicited from Mr. Lusinsky, we don't really

25   have a fear of resignations here.  Why do I say that?

Page 15

1 When we argued the board compensation motion, I think

2 it was August 31st, it took one director two weeks to

3 resign, a second director five weeks to resign, and

4 now they've asked for further relief from that order

5 in order not to reduce the board of directors to

6 number three.  So, no one is walking out the door.

7 With the coverage issue, we believe and

8 Mr. Bloom talked about risk, the risk is low.  We're

9 talking about a period where most things have been

10 brought before this court for court approval.  The

11 risk is claims.  We think that the risk of the claims

12 is low.  Furthermore, there's $16 million sitting in

13 the debtor's accounts.  I think that as of the last

14 DIP report it was 18 million, but Mr. Bloom said it

15 was 16 million.

16 So, if there is a right to

17 indemnification, if there is an administrative claim,

18 the directors and Mr. Lusinsky are protected.  There's

19 cash in this estate.  So we think that risk is low.

20 That it's not prudent to use $101,000 to purchase that

21 additional coverage.

22 THE COURT:  So let me ask you a question,

23 Ms. Lopez-Castro.  So you're saying that your client

24 constituency, your committee on behalf of the people

25 for whom it is acting as a fiduciary, say they are

Page 16

```
1    willing to risk the 16 million not to spend the 101;
2    is that what you're saying?
3              MS. LOPEZ-CASTRO:  In light of --
4              THE COURT:  And that's the judgment call
5    they're making?
6              MS. LOPEZ-CASTRO:  Right.
7              THE COURT:  Your committee has made that
8    decision?  They're willing to put at risk all the cash
9    in the estate on an indemnification obligation to
10   directors so they don't have to pay 101,000?
11             MS. LOPEZ-CASTRO:  They don't believe
12   that's a good use of the cash, Your Honor.  And using,
13   for example, if we analogize to a cash collateral
14   hearing --
15             THE COURT:  Uh-huh.
16             MS. LOPEZ-CASTRO:  -- and we were arguing
17   over budget items --
18             THE COURT:  Uh-uh.
19             MS. LOPEZ-CASTRO:  -- and the lender says,
20   I will not allow you to use 101,000 to buy DNO
21   coverage for this particular period.
22             THE COURT:  No, I understand that, but I'm
23   trying to understand because the 16 million arguably
24   is your constituency's money ultimately --
25             MS. LOPEZ-CASTRO:  Yes.
```

Page 17

1          THE COURT:  -- that is portioned of -- so
2    I just want to make sure I understand that your
3    committee has made a decision that they would rather
4    put the 16 million at risk, than pay 101.
5          MS. LOPEZ-CASTRO:  We don't think that
6    that's a real risk, Your Honor.  Because for that
7    period that we're talking about; right?
8          THE COURT:  Uh-huh.
9          MS. LOPEZ-CASTRO:  That November 10th,
10   2008 to November 10, 2009.
11         THE COURT:  Right.
12         MS. LOPEZ-CASTRO:  Most of the acts that
13   are at issue in this case that we've heard about in
14   the papers precede that.  In fact, he talked about the
15   policy.  We have two sets of policies.
16         THE COURT:  Mr. Bloom?
17         MS. LOPEZ-CASTRO:  Yes, Mr. Bloom.  Talked
18   about two sets policies.
19         THE COURT:  Right.
20         MS. LOPEZ-CASTRO:  The second set of
21   policies for which, I think, there's a total of $30
22   million coverage right now.
23         THE COURT:  Uh-huh.
24         MS. LOPEZ-CASTRO:  Are -- there's a
25   regulatory exception so the regulatory agencies can't

Page 18

1    access it.

2                   THE COURT:  Uh-huh.

3                   MS. LOPEZ-CASTRO:  The class claimants

4    can't access it, because most of the acts at issue in

5    this case preceded that policy period.

6                   THE COURT:  Uh-huh.

7                   MS. LOPEZ-CASTRO:  I'm not saying there

8    are no claims to be accessed, but that's going to be

9    more difficult than the previous set of policies.

10                  THE COURT:  Uh-huh.

11                  MS. LOPEZ-CASTRO:  And if the debtor in

12   this case or the debtors in this case have wanted to

13   do something, believed they needed to do something,

14   they've asked this Court for court approval.

15                  THE COURT:  Uh-huh.

16                  MS. LOPEZ-CASTRO:  So the risk of

17   negligence claims, we view as very low, and if they're

18   fraud claims, they're not covered.  And they're not

19   covered by the indemnification provisions of the

20   bylaws of Florida statutes.  So, you -- I understand

21   why this Court and even in some ways the debtor, you

22   don't want this coverage?  And we don't -- the estate,

23   the creditors committee does not want to spend

24   $101,000 on this coverage.  We don't think that's a

25   good use of the cash.

1            THE COURT:  But what about the semi-tail

2    as I've called it, this small reach back?

3            MS. LOPEZ-CASTRO:  It's the same thing,

4    it's all together.  For the reasons that I just, you

5    know, explained, we don't think that the risk of

6    claims during that policy period are that great, and

7    that semi-tail still does not convince the creditors

8    committee which thought about this long and hard that

9    it should -- it's appropriate to use that cash.

10           THE COURT:  Okay.  All right.  So

11   continue.

12           MS. LOPEZ-CASTRO:  That's it.

13           THE COURT:  Okay.  Well, let me ask you

14   something else.  I understand what you're saying.  You

15   believe that the likelihood is very low especially

16   because everything is done with Court approval, and

17   that you don't believe that the directors are going to

18   walk, because you can't get rid of them even when

19   you're trying.

20           MS. LOPEZ-CASTRO:  Right.

21           THE COURT:  Okay.

22           MS. LOPEZ-CASTRO:  Well, and that's just

23   circumstantial because I've just -- I don't know

24   what's happened, but we've seen that it took a while

25   for some of the directors to resign, and other

1    directors do not want to resign.

2              THE COURT:  Uh-huh.  Well, let me ask you

3    this, let's just say that I agree with you.  That this

4    is your risk, and if you blow it and the -- all the

5    cash in the estate has to go out to pay this

6    indemnification obligation which is there under the

7    bylaws, it's there, so that's a contractual right that

8    they have.

9              MS. LOPEZ-CASTRO:  Uh-huh.

10              THE COURT:  And let's just say that

11    everybody does leave, they say, you know what, it's my

12    $1,500 a month or whatever it is --

13              MS. LOPEZ-CASTRO:  Right.

14              THE COURT:  -- that they've agreed to

15    accept.  It's just not worth it, and they leave.  So

16    then I would have to appoint a trustee, and that's

17    also a risk that the board -- that the committee is

18    willing to take?

19              MS. LOPEZ-CASTRO:  Your Honor, we have

20    fiduciary duties.  We can't take actions because, you

21    know, there may be a trustee or not be a trustee.  We

22    have a lot of confidence in Mr. Lusinsky and that's

23    one of the reasons why we opposed spending this money

24    because Mr. Lusinsky is the CRO.

25              THE COURT:  Right.

Page 21

```
 1              MS. LOPEZ-CASTRO:  He consults with the

 2    board, but we have a lot of confidence in him.

 3              THE COURT:  No, no.  I understand that,

 4    but understand that the U.S. Trustee is taking the

 5    position no board, no CRO.

 6              MS. LOPEZ-CASTRO:  And I don't think

 7    that's correct, Your Honor, and that might be hearing

 8    that we may have before you.

 9              THE COURT:  Uh-huh.

10              MS. LOPEZ-CASTRO:  If the entire board

11    resigns, and it's brought before this Court whether

12    Mr. Lusinsky in the posture of this case where we have

13    a liquidating debtor which is trying to preserve

14    NOL's --

15              THE COURT:  Uh-huh.

16              MS. LOPEZ-CASTRO:  -- and monetize assets

17    or claims rather, so we're not talking about a debtor

18    here where Mr. Lusinsky has to decide, okay, do we

19    approve this loan or not approve this loan?  Do we

20    want to go in this business direction or not this

21    business direction?  That's not BankUnited Financial

22    Corp., that's not where we are.

23              So, in the context of all of that, the

24    minimal business, the competence of Mr. Lusinsky, the

25    matters coming before this Court for court approval,
```

1   yeah, we could each make a decision -- we could each

2   make an argument that there's that very small risk

3   maybe you should buy the coverage, but the committee

4   made of sophisticated people think, you know what,

5   it's not worth it.  And if we had come back before

6   this Court because the U.S. Trustee's Office has filed

7   a motion to appoint a trustee, if the directors

8   resign, then I think that's something that we'll deal

9   with then.  I don't think that's an appropriate motion

10  in  light of what this debtor is doing at this time.

11            THE COURT:  Well, let me ask you another

12  question, but if I understand Mr. Bloom's proffer,

13  it's on Mr. Lusinsky's recommendation that this

14  insurance is being obtained.

15            MS. LOPEZ-CASTRO:  I think it's -- what he

16  said was, Mr. Lusinsky in consultation with the board.

17            THE COURT:  Okay.

18            MS, LOPEZ-CASTRO:  Mr. Lusinsky's

19  employment, and this was an issue we looked at,

20  provides if there is coverage that is DNO coverage --

21            THE COURT:  Uh-huh.

22            MS. LOPEZ-CASTRO:  -- Mr. Lusinsky has to

23  be part of that coverage or included.

24            THE COURT:  Right.

25            MS. LOPEZ-CASTRO:  However, it's not a

1    requirement for his continued employment.

2              THE COURT:  Right.  Which he has

3    confirmed.

4              MS. LOPEZ-CASTRO:  Right.

5              THE COURT:  Okay.  All right.  Mr. Berman,

6    did you have anything you wanted to say on behalf of

7    the FDIC?

8              MR. BERMAN:  Your Honor, it's simply that

9    we join in the committee's objection, and just to make

10   two points which I think are part of what that

11   presentation was, and we've said before that we've --

12   this is really a bank holding company without a bank

13   any longer.  It appears that what the function of the

14   board is, is predominantly to monitor the performance

15   of the CRO.  And doing all of that in the court

16   supervision and a public preceding where if people

17   have problems they have a right to stand up and be

18   heard.  So, it seems to us that this is something

19   which is unnecessary because it's really essentially

20   for post-petition activity, but for his, as Your Honor

21   pointed out, that sort of quasi tail, but there some

22   very competent people who have, I think, now

23   identified claims, with very substantial claims with

24   reasonable detail both on the committee side and on

25   the FDIC side.  So, I don't think that quasi tail,

Page 24

1    whatever you want to refer to it, has that much value.

2              And lastly, the -- Your Honor has asked

3    questions about putting this 16 million at risk.  But

4    I thought I heard that this was $5 million of

5    coverage, so it's -- they've already decided to put

6    $11 million of that 16 at risk, I suppose.  And what

7    we're saying, which is the same thing as the committee

8    is saying, that extra $5 million seems like very

9    expensive protection to get given the activity that it

10   is sought to cover.

11             THE COURT:  Okay.  Thank you, Mr. Berman.

12   Mr. Pearson, I'm not sure if you have a position?

13             MR. PEARSON:  Nothing to say, Your Honor.

14             THE COURT:  Okay.  Mr. Bloom, any response

15   to the comments that have been made?

16             MR. BLOOM:  Very briefly, Your Honor.  No

17   disrespect intended to committee counsel at all, but

18   it appears that they and their committee are willing

19   to speculate a good deal more than the debtor's find

20   prudent to do in this instance.  Insofar as the

21   speculation about whether any directors will resign, I

22   don't know that that speculation is informed by any

23   facts at all.  But I don't even want to get into that

24   because our objective here today is simply to seek

25   authority from the Court not to play a game of

1   brinksmanship with the Court, and say this or that

2   director has intonated or threatened, that he or she

3   may resign if we get this coverage and not that, or if

4   we get no coverage at all.  It's not about protecting

5   the directors, as I think Your Honor grasped.  It's

6   about protecting the company, and whether we're going

7   to put the $16 million, the $18 million at risk.

8          Insofar as what that risk is concerned,

9   the speculation that there is no claim that's out

10  there that's likely to jump up and be asserted, I

11  certainly hope that that's true.  I will only point

12  out to the Court, that this is a company that has

13  upwards of $400 million in public debt outstanding

14  under various issues,  and it's a company that has by

15  last count more than 1,000 street name record owners

16  of its stock, which could mean that there are untold

17  thousands more actual beneficial owners of its stock.

18  Whether there is some one out who will file some type

19  of claim that would be covered within the scope of

20  this insurance coverage, is something that we don't

21  want to speculate on except again to say, if this

22  coverage is going to be allowed to expire, it's not

23  going to because the debtors made a subjective

24  judgment that it wasn't worth protecting the house

25  against buyer.  It's not going to be because we've

Page 26

1    determined not to go ahead and continue it.

2              THE COURT:  Well, let me ask you a

3    question, Mr. Bloom, with respect to Mr. Berman's

4    point that this coverage would only be for $5 million,

5    so that to the extent that the indemnification

6    obligation exceeded 5 million, that nonetheless estate

7    assets would be at risk; is that correct?

8              MR. BLOOM:  That is.  It's correct, but

9    there are two points about that.  First of all, we

10   learned this morning because the board was interested

11   in knowing about coverage not only for lower, but

12   higher policy limits.

13             THE COURT:  Uh-huh.

14             MR. BLOOM:  The $5 million is the highest

15   policy limit that was available.  The carrier who

16   proposed $5 million, HCC, is not willing to propose

17   anything higher.  So we have two proposals for them --

18   from them for the identical coverage at -- one at 3

19   million, and one at 5 million.  And then the other

20   issue comes down to what is reasonable.  I suspect

21   that there a lot of people sitting in this courtroom

22   today, certainly Mr. Berman to my left, who represents

23   the FDIC and Ms. Lopez-Castro to my right who

24   represents the committee clothed with derivative

25   standing to pursue director and officer claims, I

1   suspect they both wish that someone had decided a few

2   years ago that the $30 million coverage that the

3   company had was inadequate.  The FDIC is alleging

4   claims or threatening claims for substantially more

5   than that.  I don't know what if any claims the

6   committee will assert in its derivitive capacity, but

7   hindsight is always 20/20.  We're here today as a

8   matter of foresight.  I again apologize to the Court

9   that we're here on an emergency basis, but it is what

10  it is.  There really are 3 options; the $5 million

11  coverage that the debtors want and recommend, the

12  lessor $3 million coverage which is 40 percent less

13  coverage for a one third less premium or no coverage

14  at all in which case we can just roll the dice and run

15  the hose and the sprinklers system every night and

16  hope the building doesn't burn down.

17           THE COURT:  Well, let me just ask you a

18  question.  One, the debtor's not getting tail coverage

19  because it's outrageously expensive?

20           MR. BLOOM:  Correct.

21           THE COURT:  Okay.  So the coverage we're

22  really talking about other than this little semi-tail

23  that goes back to November of 2008, and by way, just

24  so I can confirm, there is coverage through the end of

25  the day today?

Page 28

1          MR. BLOOM:  12:01 a.m. tomorrow, yes.

2          THE COURT:  Okay.  But without the tail,

3    any claims that have not been made for the period from

4    November of '08 until today, would no longer be

5    covered because -- if the claim had not already been

6    made.

7          MR. BLOOM:  If a claim is not made and

8    what determines making of the claim, and I hope

9    Mr. Friel is listening attentively because this may be

10   an area in which he will have to correct me.

11         THE COURT:  Are you paying attention?

12         MR. FRIEL:  I'm here.

13         THE COURT:  Okay.  He's listening

14   carefully.

15         MR. BLOOM:  What determines whether a

16   claim is actually made varies based upon the language

17   under the particular policy.

18         THE COURT:  Uh-huh.

19         MR. BLOOM:  The only claim that has been

20   made in the sense of litigation having been filed, is

21   that shareholder litigation.  The FDIC has provided

22   notice to the prior insureds, pre-petition directors

23   or -- directors and officers during the pre-petition

24   period.  Don't know what, if anything, the committee

25   has done, but Your Honor is correct, if those claims

1  are not made in accordance with the policy language by

2  12:01 a.m. tomorrow, then there would be no coverage

3  for them.

4           THE COURT:  Okay.  And that would not

5  change whether I grant this relief of not; isn't that

6  correct?

7           MR. BLOOM:  That's correct.

8           THE COURT:  Okay.  And with respect to the

9  coverage other than this little semi-tail --

10          MR. BLOOM:  Yes.

11          THE COURT:  -- we're really talking about

12 actions of the officers and directors that they would

13 or would not perform during the year starting tomorrow

14 at 12:01 a.m.?

15          MR. BLOOM:  Except with respect to the

16 semi-tail, that's correct.  That is correct, yes.

17          THE COURT:  Okay.

18          MR. BLOOM:  The semi-tail taking it back

19 to a prior year in respect of any claims that are

20 independent from and not related to those that are the

21 subject of existing claims, pending claims.

22          THE COURT:  Okay.  But it would -- they

23 could fall into the same category or these would be

24 completely different kinds of claims?  So, for

25 example, if somebody -- you mentioned the thousand

1    shareholders, if all of a sudden a shareholder woke up

2    tomorrow and said, oh, my goodness.  Where have I

3    been.  I need to sue somebody because the officers of

4    the holding company really messed up here.  Then is

5    that something that would be covered under the

6    semi-tail?

7              MR. BLOOM:  I would defer to Mr. Friel

8    after saying that, as I understand it, insurers take a

9    very restrictive rule -- very restrictive view on the

10   question about whether a claim is separate, and if the

11   insurers can establish that it is in any way related

12   to a claim that has previously been brought or

13   noticed, then they would deny coverage under the

14   semi-tail, meaning if it arise out of -- arises out of

15   the same acts or omissions --

16             THE COURT:  Uh-huh.

17             MR. BLOOM:  -- it would not be covered

18   under what the Court has referred to as the semi-tail.

19             THE COURT:  Okay.  So this would have to

20   be something unrelated to all the noise that's been

21   going on?

22             MR. BLOOM:  To invoke the semi-tail, that

23   is my understanding.

24             THE COURT:  Uh-huh.

25             MR. FRIEL:  That's correct.  This is Brian

Page 31

1    Friel, that's correct.

2                THE COURT:  Okay.  So, Mr. Friel, based on

3    that what possible claims are we talking about, not

4    paying the light bill?  I mean, just help me out.

5    What would fall under this semi-tail?

6                MR. FRIEL:  Well, if I could, in terms of

7    what types of claims could be out there, Mr. Bloom is

8    probably in a better position to answer that, but I

9    will say just generally, you know, what claims could

10   be brought are always up to the creative mind of a

11   plaintiff's lawyer --

12               THE COURT:  Yes.

13               MR. FRIEL:  -- and his or her client.

14               THE COURT:  Uh-huh.

15               MR. FRIEL:  So it's almost impossible to

16   predict, even to try to predict what type of new claim

17   will be brought.  But in my experience, it's hard to

18   control what a shareholder would -- will do --

19               THE COURT:  Right.

20               MR. FRIEL:  -- direct or a beneficial or

21   what type of creative lawyering is out there, and in

22   large respects, a policy like this, particularly at

23   this level, whether it's 3 million or 5 million really

24   should be viewed as a defense policy, and not what you

25   consider as an indemnity policy for a  settlement or

1   judgment --

2            THE COURT:  Uh-huh.

3            MR. FRIEL:  -- and it's -- you can have

4   even arguably the most frivolous of claims that are

5   new, --

6            THE COURT:  Right.

7            MR. FRIEL:  -- quote, unquote, new and

8   unrelated so they would be covered under the new

9   policy, but it costs a lot of money to defeat a claim,

10  unfortunately.

11           THE COURT:  Right.

12           MR. FRIEL:  I think everyone can vouch

13  with their own personal experience about that.

14           THE COURT:  Uh-huh.

15           MR. FRIEL:  And typically these claims are

16  brought against multiple directors and officers,

17  sometimes, not all the time, which requires each

18  individual to hire his or her own individual lawyer --

19           THE COURT:  Uh-huh.

20           MR. FRIEL:  -- which will be subject to

21  the corporate indemnity and then to the assurance

22  indemnity --

23           THE COURT:  Uh-huh.

24           MR. FRIEL:  -- to cover those defense

25  bills, and once you get two, 3, four firms involved,

1    because of some alleged conflict of interest which

2    requires multiple representation, the bills become

3    exorbitantly high very quickly.  And so, that's my

4    point on that.

5                    THE COURT:  Okay.  All right.  Thank you.

6    All right.  Anything else, Mr. Bloom?

7                    MR. BLOOM:  No, Your Honor.  Thank you

8    again.

9                    THE COURT:  Okay.  All right.  I'm going

10   to deny the motion, and -- but I'm going to make the

11   following observations.  I want to make clear now that

12   I've heard what the FDIC has said, the extent that

13   they have a dog in this fight.  I know that there's

14   been some issues regarding the FDIC standing, but

15   certainly the committee has a strong position, but I

16   want to remind you Ms. Lopez-Castro, there is a

17   contractual obligation to these people, and I will

18   not, without some incredibly cogent and compelling

19   argument, entertain any arguments by the committee if

20   any such claims be made that somehow the estate should

21   not pay them as an administrative expense.  That

22   doesn't mean the argument doesn't exist, but it will

23   have to be something that you have some strong support

24   for, because you have an elected to take this risk,

25   your constituency is going to have to bear the costs,

Page 34

1    if any, associated with that risk.

2              I'm really at this juncture talking more

3    about the prior year.  Now, with respect to going

4    forward from here, the same thing.  There is still an

5    indemnity obligation, and the debtor is obligated to

6    honor that obligation, unless there's a compelling

7    reason that you believe and of course each director or

8    officer will have to consult with their own counsel

9    regarding their level of risk.  I will also assume

10   that at such time as any that a plan is filed, if, in

11   fact, there are certain provisions in the plan that

12   those directors and officers might ask for, as long as

13   they're reasonable, I will expect to have openness

14   with respect to seeking those protections with the

15   usual limitations on those types of protections.

16             So, Ms. Lopez-Castro, and let me make the

17   follow findings:  I understand the representations and

18   I accept the proffer of Mr. Lusinsky, and this, in no

19   way, shape or form is suggesting that Mr. Lusinsky did

20   not go through the appropriate process.  But as I said

21   before, the people whose money is at risk are the

22   people whose opinion I have to think about.  To the

23   extent that it means that the board chooses to resign

24   en masse, that will obviously be their right to do

25   that.  To the extent that the consequence of that

Page 35

1   resignation is that the U.S. Trustee seeks to appoint

2   a trustee or to convert the case -- well, I don't

3   think they'll convert the case, but they seek to

4   appoint a trustee such that it engenders the loss of

5   Mr. Lusinsky and his input in -- valuable input in

6   this case, again, the people who are most directly

7   affected by that decision have made that decision.  It

8   doesn't seem in light of the low risk that the

9   expenditure of these funds at this time for what

10  Mr. Friel accurately described as defense costs, is

11  inappropriate use of the money.  I certainly don't

12  fault, however as I said before either Mr. Lusinsky or

13  the board for seeking this relief, but I will deny it

14  nonetheless.

15          MS. LOPEZ-CASTRO:  And Your Honor with

16  respect to the order, can I simply state for the

17  reasons stated on the record the motion is denied.

18          THE COURT:  As long as that's acceptable

19  to Mr. Bloom.

20          MR. FRIEL:  Your Honor?

21          THE COURT:  Yes, Mr. Friel?

22          MR. FRIEL:  I didn't know you were going

23  to go and I had one other point, and I apologize it

24  it's too late.

25          THE COURT:  No, no.  I'm --

1          MR. FRIEL:  The focus has been on how this

2   money is ultimately the creditors, and it's the risk

3   that they're taking in terms of depleting these cash

4   assets.

5          THE COURT:  Uh-huh.

6          MR. FRIEL:  But I also just want to point

7   out that there are two aspects to this renewal policy

8   which we were looking to purchase to go into effect

9   tonight at midnight.

10          THE COURT:  Uh-huh.

11          MR. FRIEL:  And the one aspect is what we

12   looked at, which is the company indemnifies that

13   these, the directors and then seeks insurance.

14          THE COURT:  Right.

15          MR. FRIEL:  The second aspect is this, and

16   this really puts it back onto the individuals who are

17   the members of the board.  By not having this

18   insurance, it puts them at risk of being bare.  And

19   what I mean by that is, the second key aspect of this

20   policy is called side A coverage --

21          THE COURT:  Uh-huh.

22          MR. FRIEL:  -- the side that we been

23   focused on up til now is called side B or coverage B.

24          THE COURT:  Uh-huh.

25          MR. FRIEL:  That's when a company

1    indemnifies the D's and N-O's and company goes to the

2    carrier to get reimbursed.

3            THE COURT:  Right.

4            MR. FRIEL:  Well, side A is when the

5    company for some reason is not required to indemnify a

6    director, because it's outside the bylaws.  It's

7    fairly -- it happens very infrequently, but it could

8    happen --

9            THE COURT:  Uh-huh.

10           MR. Friel:  -- more frequently, though,

11   when a company is required to indemnify its directors

12   and officers, but doesn't have the cash or the assets

13   to do that.  And so, the risk to the individuals is,

14   10 months from now, when that 16 or $18 million pot of

15   money is depleted for whatever reason to zero or to

16   two million, pick a number, but something less than 5

17   million, and one of these directors or officers gets

18   sued for, quote, unquote, a new claim, it then goes to

19   BankUnited and says, you're required to indemnify me.

20   The bank says, sorry, we can't.  We don't have the

21   cash on-hand, then the director can, under the policy,

22   turn to the carrier, here Houston Casualty and say,

23   side A coverage, you indemnify me directly.  There's

24   no deductible to the carrier, to the individual, I

25   mean, and if that's not available, the directors and

Page 38

1   officers will be in the unenviable position of

2   possibly having to go into their private bank

3   accounts.

4           THE COURT:  I understand that.

5           MR. FRIEL:  To fund their defense of any

6   type of new claim.

7           THE COURT:  Okay.

8           MR. FRIEL:  I just want to point that out

9   to Your Honor.

10          THE COURT:  I understand that, which is

11  why I said, if these officers and directors choose to

12  resign, they have the absolute right to do so.  That

13  won't help them with respect to last year, but of

14  course, the company has made the decision not to

15  purchase the tail in any event and this would have

16  given them just limited protection.

17          So, that's their choice.  And they'll have

18  to decide what they want to do, but I appreciate your

19  clarifying that for me.  Thank you.

20          MR. FRIEL:  Thank you.

21          THE COURT:  All right. So

22  Ms. Lopez-Castro, work with Mr. Bloom to the extent

23  Mr. Berman or Mr. Pearson would also like to see the

24  order, share it with them as well, before you submit

25  it.

Page 39

1          MS. LOPEZ-CASTRO:  I will, Your Honor.

2  Thank you.

3          THE COURT:  All right.  Thank you all very

4  much, and have a good day.

5       (Thereupon, the hearing was concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 40

1                          CERTIFICATION

2

3    STATE OF FLORIDA )

4                     )

5    COUNTY OF MIAMI-DADE)

6

7            I, Carmen E. De La Cruz, shorthand Reporter

8    and Notary Public in and for the State of Florida at

9    Large, do hereby certify that the foregoing

10   proceedings were taken before me at the date and place

11   as stated in the caption hereto on Page 1; that the

12   foregoing computer-aided transcription is a true

13   record of my stenographic notes taken at said

14   proceedings.

15

16

17           WITNESS my hand this 17 day of November,

18   2009.

19

20

21                       _____

22                       Carmen E. De La Cruz

23                       Court Reporter and Notary Public

24                       DD545111 Expiration Date 08/2011

25