## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION
### www.flsb.uscourts.gov

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| BankUnited Financial Corporation, *et al.*,[1] | ) | |
| | ) | Case No. 09-19940-LMI |
| Debtors. | ) | |
| | ) | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Todd C. Meyers, Esq.
Robbin S. Rahman, Esq.
KILPATRICK TOWNSEND
& STOCKTON LLP
1100 Peachtree Street, NE, Suite 2800
Atlanta, Georgia  30309
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
tmeyers@kilpatricktownsend.com

Corali Lopez-Castro, Esq.
KOZYAK TROPIN & THROCKMORTON, P.A.
2525 Ponce de Leon, 9th Floor
Miami, Florida 33134
(305) 372-1800 (Telephone)
(305) 372-3508 (Facsimile)
clc@kttlaw.com

Counsel for the Official Committee of Unsecured Creditors

Dated:  April 11, 2011

---

[1]The debtors are the following three entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  BankUnited Financial Corporation, a Florida corporation (7773); CRE America Corporation, a Florida corporation (0049); and BankUnited Financial Services, Incorporated, a Florida corporation (8335) (collectively, the "Debtors").

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY IN ACCORDANCE WITH THE FEDERAL OR STATE SECURITIES LAWS OR SIMILAR LAWS. THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS PROVIDED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN. THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE "COMMITTEE") BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS THAT ARE ATTACHED TO, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN, OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED IN THIS DISCLOSURE STATEMENT BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAVE BEEN MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH IN THIS DISCLOSURE STATEMENT SINCE THE DATE OF THIS DISCLOSURE STATEMENT. EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY ENTITIES DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO ONE IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN AS SET FORTH, OR INCONSISTENT WITH, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT, THE PLAN, OR THE PLAN SUPPLEMENT SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.

US2008 2227176.11

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR OTHER ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

ALTHOUGH THE COMMITTEE BELIEVES THAT THE PLAN COMPLIES WITH ALL APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, THE COMMITTEE CANNOT ASSURE SUCH COMPLIANCE OR THAT THE BANKRUPTCY COURT WILL CONFIRM THE PLAN.

ALTHOUGH THE COMMITTEE HAS USED ITS BEST EFFORTS TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT, THE FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, EXCEPT AS SPECIFICALLY INDICATED OTHERWISE.

PLEASE REFER TO ARTICLE VI OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE PLAN.

UNLESS OTHERWISE SPECIFICALLY INDICATED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED AND IS BASED ON AN ANALYSIS OF DATA AND DOCUMENTS AVAILABLE AT THE TIME OF THE PREPARATION OF THE PLAN AND THIS DISCLOSURE STATEMENT.

**THE BANKRUPTCY COURT HAS SCHEDULED THE CONFIRMATION HEARING TO COMMENCE ON [_____], 2011, AT [____] __.M. PREVAILING EASTERN TIME AT COURTROOM 1409, UNITED STATES COURTHOUSE, 51 S.W. 1ST AVENUE, MIAMI, FLORIDA 33130.  THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT OF THE ADJOURNED DATE MADE AT THE CONFIRMATION HEARING OR BY NOTICE OF ANY ADJOURNMENT OF THE CONFIRMATION HEARING FILED BY THE COMMITTEE.**

US2008 2227176.11

**TO BE COUNTED, THE BALLOTS UPON WHICH HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE SHALL CAST THEIR VOTE TO ACCEPT OR REJECT THE PLAN INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED IN ACCORDANCE WITH THE INSTRUCTIONS ON SUCH BALLOT. SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES DESCRIBED IN THE DISCLOSURE STATEMENT ORDER. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL BE COUNTED IN THE SOLE DISCRETION OF THE COMMITTEE.**

**OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE [_____] 2011, IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER. UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A AND SECTION 21E OF THE SECURITIES ACT, AS AMENDED. SUCH STATEMENTS MAY CONTAIN WORDS SUCH AS "MAY," "WILL," "MIGHT," "EXPECT," "BELIEVE," "ANTICIPATE," "COULD," "WOULD," "ESTIMATE," "CONTINUE," "PURSUE," OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY, AND MAY INCLUDE, WITHOUT LIMITATION, INFORMATION REGARDING THE COMMITTEE'S EXPECTATIONS ABOUT FUTURE EVENTS. FORWARD-LOOKING STATEMENTS ARE INHERENTLY UNCERTAIN, PARTICULARLY IN LIGHT OF THE CURRENT WORLDWIDE FINANCIAL AND CREDIT CRISIS, AND ACTUAL RESULTS MAY DIFFER FROM THOSE EXPRESSED OR IMPLIED IN THIS DISCLOSURE STATEMENT AND THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN. IN PREPARING THIS DISCLOSURE STATEMENT, THE COMMITTEE RELIED ON FINANCIAL DATA DERIVED FROM FILINGS OF THE DEBTORS OR THAT WAS OTHERWISE MADE AVAILABLE TO IT AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS. WHILE THE COMMITTEE BELIEVES THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING DISTRIBUTIONS UNDER THE PLAN. THE COMMITTEE EXPRESSLY CAUTIONS READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

AMONG THE FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM CURRENT ESTIMATES OF FUTURE PERFORMANCE ARE THE FOLLOWING: (1) THE COMMITTEE'S ABILITY TO DEVELOP, PROSECUTE, CONFIRM, AND CONSUMMATE A PLAN WITH RESPECT TO THESE CHAPTER 11 CASES; (2) THE OUTCOME AND TIMING OF EFFORTS TO SELL CERTAIN ASSETS OF THE DEBTORS; AND (3) THE OUTCOME OF LITIGATION WITH THE FDIC, CERTAIN

US2008 2227176.11

FORMER OFFICERS AND DIRECTORS OF THE DEBTORS AND VARIOUS OTHER PARTIES.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS AS OF THE FILING DATE OF THIS DISCLOSURE STATEMENT AND THE COMMITTEE IS UNDER NO OBLIGATION, AND EXPRESSLY DISCLAIMS ANY OBLIGATION, TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.

US2008 2227176.11

**TABLE OF CONTENTS**

I.     SUMMARY ........................................................................................................1

       A.     Overview of Chapter 11 ........................................................................2

       B.     The Purpose and Effect of the Plan .....................................................2

       C.     Treatment of Claims and Interests Under the Plan ..............................3

              1.     Summary of Classified Claims and Interests of BUFC ..............3

              2.     Summary of Classified Claims and Interests of BUFS ..............4

              3.     Summary of Classified Claims and Interests of CRE ................4

              4.     Unclassified Claims ...................................................................5

              5.     Summary of Classification, Treatment and Projected
                     Recoveries of Classified Claims and Interests ...........................5

       D.     Claims Estimates .................................................................................7

       E.     Transactions Contemplated by the Plan ..............................................9

       F.     Consummation .....................................................................................9

       G.     Liquidation Analysis ............................................................................9

       H.     Risk Factors .......................................................................................10

       I.     Voting and Confirmation ...................................................................10

II.    BACKGROUND TO THE CHAPTER 11 CASES .........................................13

       A.     The Business ......................................................................................13

       B.     Debt Structure ....................................................................................18

              1.     Senior Convertible Notes .........................................................18

              2.     HiMEDS Notes and Contract Adjustment Payments ...............18

              3.     Junior Subordinated Debentures ..............................................20

              4.     Trust Preferred Subordinated Debentures ................................20

US2008 2227176.11

**TABLE OF CONTENTS**
(Continued)

C.     Stock ....................................................................................................21

III.    THE CHAPTER 11 CASES ....................................................................................22

A.     Early Stages of the Chapter 11 Cases ..................................................22

B.     Tax Attributes ........................................................................................25

C.     Litigation ................................................................................................27

1.     Debtors' Litigation.....................................................................27

2.     Committee's Litigation ..............................................................30

D.     Exclusivity ..............................................................................................33

IV.    SUMMARY OF THE PLAN....................................................................................33

A.     Administrative and Priority Tax Claims ...............................................33

1.     Administrative Claims ...............................................................33

2.     Priority Tax Claims....................................................................34

B.     Classification and Treatment of Claims and Interests ..........................34

1.     Summary ....................................................................................34

2.     Summary of Classified Claims and Interests of BUFC ............35

3.     Summary of Classified Claims and Interests of BUFS.............36

4.     Summary of Classified Claims and Interests of CRE................36

5.     Classification and Treatment of Claims and Interests of
BUFC ........................................................................................36

6.     Classification and Treatment of Claims and Interests of
BUFS........................................................................................42

7.     Classification and Treatment of Claims and Interests of
CRE...........................................................................................44

US2008 2227176.11

**TABLE OF CONTENTS**
(Continued)

C.  Means for Implementation of the Plan.................................................45

 1.  Appointment of a Plan Administrator and a Plan
     Committee................................................................................45

 2.  Fees and Expenses of Liquidating BankUnited........................................46

 3.  Periodic Reports to Be Filed by Liquidating BankUnited.......................46

 4.  Directors/Officers of the Debtors on the Effective Date ..........................46

 5.  Plan Administrator ................................................................................46

 6.  Wind Down and Dissolution of the Debtors.................................................48

 7.  Cancellation of Existing Securities and Agreements;
     Claims of Subordination .................................................................49

 8.  Committee................................................................................................53

 9.  Vesting of Assets in Liquidating BankUnited ...........................................53

 10. Deregistration.........................................................................................54

 11. Intercompany Claims and Interests..........................................................54

 12. Merger/Dissolution/Consolidation............................................................54

D.  Provisions Governing Distribution ........................................................55

 1.  Initial Distribution Date ........................................................................55

 2.  Disputed Claims Reserve .......................................................................55

 3.  Quarterly Distributions .........................................................................56

 4.  Record Date for Distributions................................................................56

 5.  Delivery of Distributions .......................................................................57

 6.  Surrender of Canceled Instruments and Securities ....................................59

 7.  Manner of Cash Payments Under the Plan or the Plan
     Administrator Agreement ....................................................................60

 8.  Time Bar to Cash Payments by Check ....................................................60

US2008 2227176.11

# TABLE OF CONTENTS
## (Continued)

9.     Compliance with Tax Requirements.........................................60

10.    No Payments of Fractional Dollars..........................................61

11.    Interest on Claims ..................................................................61

12.    No Distribution in Excess of Allowed Amount of Claim.........................62

13.    Setoff and Recoupment........................................................62

14.    Contractual Subordination Rights...........................................62

E.    Disputed Claims...........................................................................62

1.     No Distribution Pending Allowance...........................................62

2.     Resolution of Disputed Claims ................................................63

3.     Objection Deadline ...............................................................63

4.     Estimation of Claims.............................................................63

5.     Disallowance of Claims ........................................................64

F.    Treatment of Executory Contracts and Unexpired Leases ...................................64

1.     Assumption and Rejection of Executory Contracts and Unexpired Leases........................................................64

2.     Claims Based on Rejection of Executory Contracts or Unexpired Leases........................................................65

G.    Conditions Precedent to Confirmation and the Effective Date............................65

1.     Conditions to Confirmation ....................................................65

2.     Conditions Precedent to the Effective Date ................................66

3.     Waiver of Conditions Precedent ..............................................66

H.    Release, Injunction, and Related Provisions...........................................67

1.     Compromise and Settlement ...................................................67

2.     Exculpation ........................................................................67

US2008 2227176.11

## TABLE OF CONTENTS
(Continued)

|  |  |  |  |
|---|---|---|---|
|  | 3. | No Release of Co-Obligor or Joint Tortfeasor | 68 |
|  | 4. | Preservation of Rights of Action | 68 |
|  | 5. | Release and Injunction | 71 |
|  | 6. | Releases of Liens | 72 |
| I. |  | Retention of Jurisdiction | 73 |
| J. |  | Miscellaneous Provisions | 75 |
|  | 1. | Final Fee Applications and Initial Trustee Fees | 75 |
|  | 2. | Payment of Statutory Fees | 75 |
|  | 3. | Modification of Plan | 76 |
|  | 4. | Revocation of Plan | 76 |
|  | 5. | Successors and Assigns | 76 |
|  | 6. | Governing Law | 77 |
|  | 7. | Reservation of Rights | 77 |
|  | 8. | Section 1146 Exemption | 77 |
|  | 9. | Section 1125(e) Good Faith Compliance | 78 |
|  | 10. | Further Assurances | 78 |
|  | 11. | Service of Documents | 78 |
|  | 12. | Filing of Additional Documents | 80 |
|  | 13. | Aid and Recognition | 80 |
|  | 14. | Document Retention | 80 |

US2008 2227176.11

**TABLE OF CONTENTS**
(Continued)

V.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ................81

    A.    The Confirmation Hearing ...................................................................81

    B.    Confirmation Standards ......................................................................81

    C.    Financial Feasibility...........................................................................83

    D.    Best Interest of Creditors Test ...........................................................83

    E.    Acceptance by Impaired Classes ........................................................85

    F.    Confirmation Without Acceptance by All Impaired Classes................86

        1.    No Unfair Discrimination ........................................................87

        2.    Fair and Equitable Test ...........................................................87

VI.    CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING.................89

    A.    Certain Bankruptcy Law Considerations ............................................89

        1.    Parties in Interest May Object to the Plan's Classification
            of Claims and Interests...........................................................89

        2.    Failure to Satisfy Vote Requirements ......................................90

        3.    The Committee May Not Be Able to Secure Confirmation
            of the Plan ..............................................................................90

        4.    Nonconsensual Confirmation...................................................91

        5.    The Committee May Object to the Amount or
            Classification of a Claim.........................................................92

        6.    The FDIC Has Asserted a Claim under section 365(o) of
            the Bankruptcy Code...............................................................92

        7.    Risk of Non-Occurrence of the Effective Date.........................93

        8.    Contingencies Could Affect Votes of Impaired Classes to
            Accept or Reject the Plan........................................................93

US2008 2227176.11

# TABLE OF CONTENTS
### (Continued)

B.    Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims ...................................................................................93

    1.    The Committee Cannot State with any Degree of Certainty What Recovery Will Be Available to Holders of Allowed Claims in Voting Classes ..........................................................93

    2.    The Debtors Are Involved in Litigation Which, if Adversely Determined, Could Result in Substantially Less Funds Being Available for Distribution....................................94

C.    Disclosure Statement Disclaimer........................................................94

    1.    Information Contained Herein Is for Soliciting Votes.............................94

    2.    This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission................................94

    3.    Reliance on Exemptions from Registration Under the Securities Act....................................................................95

    4.    No Legal Advice is being provided in this Disclosure Statement.......................................................................95

    5.    No Admissions Made.................................................................95

    6.    Failure to Identify Litigation Claims or Projected Objections..........................................................................96

    7.    No Waiver of Right to Object or Right to Recover Transfers and Assets................................................................96

    8.    Information Was Provided by the Debtors and Was Relied Upon by the Committee's Professionals....................................96

    9.    Potential Exists for Inaccuracies, and the Committee Has No Duty to Update...................................................................97

    10.    No Representations Outside this Disclosure Statement Are Authorized.................................................................97

D.    Liquidation Under Chapter 7 ..............................................................97

US2008 2227176.11

**TABLE OF CONTENTS**
(Continued)

VII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES ............98

    A.    Certain United States Federal Income Tax Consequences to the
       Holders of Allowed Claims .....................................................................99

        1.    Consequences to Holders of Administrative Claims ................................99

        2.    Consequences to Holders of Secured Claims .........................................100

        3.    Consequences to Holders of Non-FDIC Priority Claims.........................100

        4.    Consequences to Holders of Unsecured Claims .....................................100

        5.    Consequences to Holders of Interests .....................................................101

        6.    Accrued Interest ......................................................................................101

        7.    Market Discount.......................................................................................102

        8.    Information Reporting and Backup Withholding ....................................103

    B.    Certain United States Federal Income Tax Consequences to the
       Debtors and Liquidating BankUnited .....................................................103

        1.    Cancellation of Debt Income ..................................................................103

        2.    Limitation on NOLs .................................................................................104

VIII.    PLAN SUPPLEMENT ........................................................................................105

IX.    CONCLUSION AND RECOMMENDATION................................................105

<u>EXHIBITS</u>

Exhibit A – Plan

Exhibit B – Liquidation Analysis

US2008 2227176.11

## I.    SUMMARY

The following summary of this Disclosure Statement is qualified in its entirety by the more detailed information contained in the Plan and elsewhere in this Disclosure Statement.[2]

On May 22, 2009 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Florida, Miami Division (the "Bankruptcy Court").  Judge Laurel M. Isicoff is presiding over the Debtors' Chapter 11 Cases.  The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.

BankUnited Financial Corporation ("BUFC") was the direct parent of BankUnited, FSB (the "Bank"), a federally chartered savings institution, through which BUFC primarily conducted its business.  BUFC is also the 100% direct owner of (i) CRE America Corporation ("CRE"), a Debtor which holds a time share interest in certain real property located in New York City; and (ii) BankUnited Financial Services, Incorporated ("BUFS"), a Debtor which was organized in 1997 for the purpose of selling annuities, mutual funds and other insurance and securities products.

This Disclosure Statement is filed by the Committee pursuant to section 1125 of the Bankruptcy Code and is being submitted to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes to accept or reject the Plan and the hearing to

---

[2] Capitalized terms used and not otherwise defined in this Disclosure Statement shall have the meaning ascribed to them in the Plan.

US2008 2227176.11

consider confirmation of the Plan, which is scheduled for _____, 2011, at _____.  A copy of the Plan is attached hereto as Exhibit A and incorporated herein by reference.

### A.       Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code.  The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the commencement of the chapter 11 case.  The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a debtor in possession.  **As a result of various factors described more fully herein, the Committee believes that the Plan is in the best interests of the Debtors' creditors.**  To fairly and expeditiously distribute the Debtors' assets consistent with the Bankruptcy Code, the Committee has proposed the Plan.  Prior to soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the chapter 11 plan.  This Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

### B.       The Purpose and Effect of the Plan

The Plan provides for the monetization and distribution of the assets of the Debtors for the benefit of Holders of Allowed Claims.  These assets will be distributed to Holders of Allowed Claims on or after the Effective Date of the Plan.  In order to effectuate the Distributions, the Plan provides that all of the assets of the Debtors' Estates (including Causes of Action not expressly released under the Plan) shall vest in Liquidating BankUnited.  Liquidating

2

BankUnited shall continue in operation in order to monetize the remaining assets, continue litigation with the FDIC and potentially pursue litigation against other parties, and make distributions under the Plan.  The Plan Administrator shall be appointed on the Effective Date of the Plan and shall be responsible for implementing the Plan, subject to the oversight of the Plan Committee.

The Committee believes that the Plan maximizes recoveries for Holders of Allowed Claims and strongly recommends that you vote to accept the Plan (if you are entitled to vote). The Committee believes that any alternative to confirmation of the Plan, such as conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or attempts by other parties in interest to file competing plans, would result in significant delay, litigation, and additional costs, and, ultimately, would lower the recoveries for all Holders of Allowed Claims.

**C.      Treatment of Claims and Interests Under the Plan**

The Plan divides all Claims, other than Administrative Claims and Priority Tax Claims, and all Interests into various Classes.  Listed below is a summary of the Classes of Claims and Interests under the Plan, including status and voting rights pursuant thereto.

**1.      Summary of Classified Claims and Interests of BUFC**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | BUFC Secured Claims | Unimpaired | No (deemed to accept) |
| 2 | Non-FDIC Priority Claims | Unimpaired | No (deemed to accept) |
| 3 | FDIC Priority Claims | Impaired | Yes |
| 4 | Senior Notes Claims | Impaired | Yes |
| 5 | BUFC General Unsecured Claims | Impaired | Yes |
| 6 | Subordinated Notes Claims | Impaired | Yes |
| 7 | BUFC Preferred Stock Interests | Impaired | No (deemed to reject) |
| 8 | BUFC Common Stock Interests | Impaired | No (deemed to reject) |

3

2.      **Summary of Classified Claims and Interests of BUFS**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | BUFS Secured Claims | Unimpaired | No (deemed to accept) |
| 2 | BUFS General Unsecured Claims | Impaired | Yes |
| 3 | BUFS Stock Interests | Impaired | Yes |

3.      **Summary of Classified Claims and Interests of CRE**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | CRE General Unsecured Claims | Impaired | Yes |
| 2 | CRE Stock Interests | Impaired | Yes |

The following tables summarize the Classes of Claims and Interests under the Plan, as well as the treatment of such Classes and projected recoveries.  To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the information set forth in the Plan, the Plan shall govern.  The projected recoveries are based upon certain assumptions contained in the Liquidation Analysis prepared by the Committee and its Professionals.  The ranges of recoveries listed below are based on various assumptions, including assumptions regarding asset realization, the total amount of the Allowed General Unsecured Claims, Senior Notes Claims, Subordinated Notes Claims, FDIC Priority Claims, Administrative Claims, Non-FDIC Priority Claims and Priority Tax Claims with respect to each of the Debtors, and assumptions concerning the costs to monetize the Debtors' assets and pursue certain litigation.  In addition, absent a successful resolution of the FDIC Priority Claims, no Distributions will be made to Holders of Allowed Claims in any BUFC Classes, other than Class 1 and Class 2.  The timing of any resolution of the FDIC Priority Claim and any resulting Distribution cannot be estimated or predicted with any certainty.  The classification, treatment and the projected recoveries of classified Claims and Interests under the Plan are described in

4

summary form below for illustrative purposes only and are subject to the more detailed and complete descriptions contained in Article III of the Plan.

**4.      Unclassified Claims**

| Claim | Plan Treatment | Range of Estimated Claims | Projected Recovery Under the Plan |
|---|---|---|---|
| Administrative Claims | Paid in full in Cash | | 100% |
| Priority Tax Claims | Paid in full in Cash | | 100% |

**5.      Summary of Classification, Treatment and Projected Recoveries of Classified Claims and Interests**

| | | **BUFC CLAIMS AND INTERESTS** | | |
|---|---|---|---|---|
| **Class** | **Claim or Interest** | **Plan Treatment of Class** | **Range of Estimated Claims** | **Projected Recovery Under the Plan** |
| 1 | BUFC Secured Claims | (1) Paid in full in Cash, (2) receive collateral securing its Allowed Secured Claim, plus post-petition interest if required by section 506(c) of the Bankruptcy Code, or (3) receive other treatment rendering Secured Claim Unimpaired | $0 | 100% |
| 2 | BUFC Non-FDIC Priority Claims | Each Holder shall receive Cash equal to full amount of its Allowed Claim, unless Holder agrees to less favorable treatment | De minimis | 100% |

US2008 2227176.11

| 3 | BUFC FDIC Priority Claims | Each Holder of an Allowed FDIC Priority Claim shall receive all Net Free Cash as it is available until such Allowed Claim is paid in full | $0 to $1.467 billion[3] | N/A |
|---|---|---|---|---|
| 4 | Senior Notes Claims | Each Allowed Senior Notes Claim shall receive a Pro Rata Distribution of Residual Net Free Cash | Approximately $321 million | 0% to 18.4%[4] |
| 5 | BUFC General Unsecured Claims | Each Allowed General Unsecured Claim shall receive a Pro Rata Distribution of Residual Net Free Cash | $200,000 to $50 million[5] | 0% to 10.5% |
| 6 | Subordinated Notes Claims | Each Allowed Subordinated Notes Claim shall receive a Pro Rata Distribution of Residual Net Free Cash, but subject to subordination provisions with respect to the Senior Notes Claims | Approximately $245 million | 0% |
| 7 | BUFC Preferred Stock Interests | Deemed Cancelled | N/A | 0% |
| 8 | BUFC Common Stock Interests | Deemed Cancelled | N/A | 0% |

---

[3] The Committee believes that a very strong argument can be made that an FDIC Priority Claim will not be Allowed in any amount. If, however, it is determined that BUFC is entitled to receive the Tax Refunds (as defined later in this Disclosure Statement) in excess of $50 million, then the FDIC will very possibly have an Allowed general unsecured nonpriority Claim in Class 5 against BUFC for a significant portion of the amount of the Tax Refunds, except to the extent that BUFC has a right of offset. See Article III.C of this Disclosure Statement for a more detailed discussion of the Tax Refunds and litigation with the FDIC related thereto.

[4] In accordance with contractual subordination provisions in the Indentures, which are not impacted by the Plan, the Distribution attributable to and on account of Holders of Subordinated Notes Claims (Class 6) will be made to Holders of Senior Notes Claims (Class 4). For purposes of this analysis of projected recoveries, it is assumed that the Holders of Class 6 Subordinated Notes Claims will be subordinated to Class 4 and Distributions attributable to Class 6 will be paid over to Holders of Senior Notes Claims in Class 4.

[5] See footnote 3.

US2008 2227176.11

| BUFS CLAIMS AND INTERESTS | | | | |
|---|---|---|---|---|
| **Class** | **Claim or Interest** | **Plan Treatment of Class** | **Range of Estimated Claims** | **Projected Recovery Under the Plan** |
| 1 | BUFS Secured Claims | (1) Paid in full in Cash, (2) receive collateral securing its Allowed Secured Claim plus post-petition interest if required by section 506(c) of the Bankruptcy Code, or (3) receive other treatment rendering Secured Claim Unimpaired | $0 to $2.032 million | 100% |
| 2 | BUFS General Unsecured Claims | Each Allowed General Unsecured Claim shall receive a Pro Rata Distribution of Residual Net Free Cash | $0 to $254,000 | 100% |
| 3 | BUFS Stock Interests | Payment of any Residual Net Free Cash in BUFS to BUFC after payment in full of all Allowed Claims | N/A | $0 to $2 million |

| CRE CLAIMS AND INTERESTS | | | | |
|---|---|---|---|---|
| **Class** | **Claim or Interest** | **Plan Treatment of Class** | **Range of Estimated Claims** | **Projected Recovery Under the Plan** |
| 1 | CRE General Unsecured Claims | Each Allowed General Unsecured Claim shall receive a Pro Rata Distribution of Residual Net Free Cash | De minimis | 100% |
| 2 | CRE Stock Interests | Payment of any Residual Net Free Cash in CRE to BUFC after payment in full of all Allowed Claims | N/A | $500,000 to $800,000 |

### D.    Claims Estimates

Debtor BUFC's primary obligations are principal and interest payments on its senior

convertible notes, trust debentures, floating rate junior subordinated debentures, and HiMEDS

US2008 2227176.11

units.  As of the Petition Date, BUFC's interest-bearing liabilities totaled approximately $565.653 million, consisting of  (i) $120 million in principal and $843,750.00 in interest attributable to the senior convertible notes, (ii) $237.261 million in principal and approximately $7.67 million in interest attributable to the trust debentures, (iii) $12.5 million in principal and $100,500 in interest attributable to the floating rate junior subordinated debentures, and (iv) $184 million in principal, $3,092,988.89 in interest, and $184,511.11 in contract adjustment payments attributable to the HiMEDS units.  These debt obligations are all unsecured obligations of BUFC and are discussed in more detail later in this Disclosure Statement.

In addition, the FDIC has filed proofs of claim in the Debtors' Chapter 11 Cases in an unliquidated amount, but in excess of $1 billion.  The FDIC's proof of claim filed in Debtor BUFC's Chapter 11 Case is designated as a priority Claim by the FDIC.  As discussed later in this Disclosure Statement, the Debtors have filed an objection (pursuant to an adversary proceeding) to the FDIC's Claims and vigorously dispute the validity and classification of the same.

BankUnited, a de novo federal savings association organized under the laws of the United States having its principal place of business in Coral Gables, Florida ("New Bank"), acquired substantially all of the Bank's assets and certain of its liabilities.  New Bank has filed proofs of claim for in excess of $2.2 million in the Chapter 11 Case of BUFS.  New Bank asserts a right of setoff, and thus a Secured Claim for approximately $2.032 million, against the funds in the deposit accounts of BUFS for any liabilities that it may be determined the Debtors have to New Bank under various contracts.  The Committee and, on  information and belief, BUFS, dispute the validity of New Bank's Claims.

US2008 2227176.11

Various other Claims have been filed in the Debtors' Chapter 11 Cases; however, the Claims discussed above constitute the most significant in amount of Claims.

### E.    Transactions Contemplated by the Plan

On the Effective Date, all of the Debtors' assets shall be transferred to and vest in Liquidating BankUnited.  The Plan provides for the appointment of _____ as the Plan Administrator and _____ as the members of the Plan Committee to oversee the activities of Liquidating BankUnited.

The Plan Administrator, supervised by the Plan Committee, shall be responsible for administering Liquidating BankUnited as set forth under the Plan and the Plan Administrator Agreement, including monetizing all of Liquidating BankUnited's assets, resolving all Claims, pursuing all Causes of Action and distributing Net Free Cash and Residual Net Free Cash.

### F.    Consummation

Following confirmation, the Plan will be consummated on the Effective Date, which is the date that is the first Business Day after the Confirmation Date on which no stay of the Confirmation Order is in effect and all conditions to the occurrence of the Effective Date have been satisfied or waived.  Distributions to be made under the Plan will be made on or as soon as reasonably practicable after the Effective Date in accordance with the Plan.

### G.    Liquidation Analysis

The Committee believes that the Plan will produce a recovery for Holders of Allowed Claims against the Estates that is no less than what would be achieved in a liquidation pursuant to chapter 7 of the Bankruptcy Code.  In fact, the Committee believes recoveries under the Plan for Holders of Allowed Claims will likely be more than in a chapter 7 liquidation because of, among other things, (1) the additional Administrative Claims generated by conversion to chapter

7 cases and (2) the administrative costs of liquidation and associated delays in connection with chapter 7 liquidation.

The Committee, together with its Professionals, has prepared a Liquidation Analysis, a copy of which is attached to this Disclosure Statement as Exhibit B, to assist Holders of Claims in determining whether to vote to accept or reject the Plan.  The Liquidation Analysis compares the proceeds to be realized if the Debtors were to be liquidated in a hypothetical case under chapter 7 of the Bankruptcy Code with the Distributions to Holders of Allowed Claims and Interests under the Plan.  The analysis is based upon the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date.  Further, the analysis is subject to the possibility of material change, including changes with respect to economic and business conditions and legal rulings.  **Therefore, the actual liquidation value of the Debtors could vary materially from the estimates provided in the Liquidation Analysis.**

### H.    Risk Factors

Prior to voting to accept or reject the Plan, each Holder in a voting Class should carefully consider all of the information in this Disclosure Statement, especially the risk factors described in Article VI.

### I.    Voting and Confirmation

Holders of Claims in Classes 1 and 2 for BUFC and Class 1 for BUFS are Unimpaired and are conclusively presumed to accept the Plan and therefore the vote of such Holders of Claims shall not be solicited.  Holders of Interests in Classes 7 and 8 for BUFC are wholly Impaired and are also conclusively presumed to reject the Plan.  Accordingly, Holders of Interests in Classes 7 and 8 for BUFC are not entitled to vote on the Plan, and the vote of such Holders of Interests shall not be solicited.  Only Holders of Claims in Classes 3, 4, 5, and 6 for

BUFC; Classes 2 and 3 for BUFS; and Classes 1 and 2 for CRE are entitled to vote to either accept or reject the Plan.

Pursuant to sections 1126(c) and 1126(d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.  The Committee will tabulate all votes on the Plan for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and 1129(a)(10) of the Bankruptcy Code.

Assuming the requisite acceptances are obtained, the Committee intends to seek confirmation of the Plan at the confirmation hearing scheduled to commence on **[DATE]**, 2011, at **[TIME] [_]**.m., prevailing Eastern time, before the Bankruptcy Court.  Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Committee shall seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Committee also reserves the right to modify the Plan and seek confirmation consistent with the Bankruptcy Code.

The Bankruptcy Court has established **[DATE], 2011,** as the voting record date for determining which Holders of Claims are eligible to vote to accept or reject the Plan.  Ballots, along with this Disclosure Statement, the Plan, and the Disclosure Statement Order, will be mailed to all registered Holders of Claims as of the voting record date that are entitled to vote to accept or reject the Plan.

Epiq Bankruptcy Solutions, LLC is the balloting and voting agent (the "Voting Agent") to assist in the voting process.  The Voting Agent will answer questions regarding the procedures

US2008 2227176.11

and requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials, and oversee the voting tabulation.

**BALLOTS CAST BY HOLDERS OF CLAIMS IN CLASSES ENTITLED TO VOTE MUST BE RECEIVED BY THE VOTING AGENT BY THE VOTING DEADLINE, WHETHER BY FIRST CLASS MAIL, OVERNIGHT COURIER, OR PERSONAL DELIVERY.  THE BALLOTS INDICATE THAT THE BALLOT MUST BE RETURNED TO THE VOTING AGENT.   THE ADDRESS FOR BALLOTS RETURNABLE TO THE VOTING AGENT IS: EPIQ BANKRUPTCY SOLUTIONS, LLC, ATTN:  BANKUNITED, 757 THIRD AVENUE, 3RD FLOOR, NEW YORK, NEW YORK 10017, FOR ANSWERS TO ANY QUESTIONS REGARDING SOLICITATION PROCEDURES, PARTIES MAY CALL THE VOTING AGENT AT (646) 282-2400.  TO BE COUNTED, THE BALLOTS CAST BY HOLDERS INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE.  SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES DESCRIBED IN THE DISCLOSURE STATEMENT ORDER.   ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL BE COUNTED IN THE SOLE DISCRETION OF THE COMMITTEE.**

To obtain an additional copy of the Plan, this Disclosure Statement, the Plan Supplement, or other solicitation package materials (except ballots), please refer to the Debtor's restructuring website at  **www.chapter11.epiqsystems.com/bankunited** or request a copy from the Voting Agent (including ballots), either by calling (646) 282-2400 or by writing to Epiq Bankruptcy Solutions, LLC, Attn:  BankUnited, 757 Third Avenue, 3rd Floor, New York, New York 10017.

US2008 2227176.11

THE COMMITTEE BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF
GENERAL UNSECURED CREDITORS AND RECOMMENDS THAT SUCH CREDITORS
VOTE TO ACCEPT THE PLAN.

## II.    BACKGROUND TO THE CHAPTER 11 CASES

The following is a general summary of the Debtors' businesses prior to the filing of these
Chapter 11 Cases.  While the Committee has not had an opportunity to conduct an independent
investigation of all of the facts set forth below and has not received confirmation or substantial
input from the Debtors regarding the accuracy of the information contained herein, a substantial
portion of this information was set forth in the Material Loss Review of BankUnited, FSB (OIG-
10-042), conducted by the Office of Inspector General, Department of the Treasury and issued
on June 22, 2010.

### A.    The Business

Organized in 1993 as the holding company for the Bank, Debtor BUFC is incorporated in
the State of Florida and headquartered in Coral Gables, Florida.  The Bank was wholly-owned
by, and was the primary asset of, BUFC.  As a federal savings bank, the Bank was subject to
regulation and examination by the Office of Thrift Supervision ("OTS"), its primary federal
regulator, and was also subject to regulation by the Federal Deposit Insurance Corporation
("FDIC"), which insured the Bank's deposits.  As a savings and loan holding company, BUFC
was also subject to regulation and examination by the OTS.

The Bank was the largest independent bank headquartered in the state of Florida.  The
Bank conducted traditional banking activities, including residential real estate lending, which
was the largest portion of the Bank's loan portfolio.  In the case of residential real estate lending,
the Bank focused on offering nontraditional mortgage products to its customers.  Around 2003,
the Bank implemented a new business strategy under which it rapidly expanded the number and

13

amount of the residential mortgage loans it originated. This growth continued through the fourth quarter of fiscal year 2007. Debtor BUFC filed SEC reports stating that the value of the Bank's one-to-four family residential mortgage loan portfolio grew from approximately $3.3 billion as of September 30, 2003, to approximately $4.7 billion as of September 30, 2004, to $6.7 billion as of September 30, 2005, to $9.7 billion as of September 30, 2006, and to $10.8 billion as of September 30, 2007. This growth in purported loan value was attributable principally to a large expansion of the Bank's option adjustable rate mortgage ("Option ARM") loan portfolio. An Option ARM is an adjustable rate mortgage loan which permits the borrower to select from a menu of monthly payment options. Option ARMs provide a borrower with flexibility to select the amount of the monthly payment from among several options without triggering a default of the mortgage. Under an Option ARM, the borrower may elect initially to make lower monthly loan payments and limit the amount of annual increases in the required monthly payment. The payment options available to Option ARM borrowers have consequences for these borrowers. For example, the loan will negatively amortize when the borrower elects a payment option that does not cover fully the interest accruing on the loan. In a negatively amortizing loan, unpaid accrued interest is added to the principal balance of the loan, upon which interest is calculated. One consequence of a negatively amortizing loan is that the borrower's obligation on the loan increases monthly rather than decreasing or remaining constant following the monthly payment. At an event specified in the loan documents, the minimum monthly payment is "recast" to require payments that will fully amortize the outstanding loan balance over the remaining loan term. This recasting causes required monthly payments to increase, often dramatically, resulting in what the banking industry refers to as "payment shock."

US2008 2227176.11

Option ARMs increased as a percentage of the Bank's one-to-four family residential mortgage loan portfolio from 33.2% in September 2004 to 69.5% in September 2007. The Bank originated many Option ARM loans based on little or no documentation from borrowers of the type required to qualify for traditional loan products. Many borrowers obtained Option ARMs without providing documents to the Bank verifying either their assets, income, or employment status, or a combination of these criteria. As of March 31, 2008, only 17.4% of all loans (including Option ARMs) in the Bank's one-to-four family residential mortgage loan portfolio consisted of "full documentation employment verified" ("Full Documentation") loans. Approximately 73.6% of this loan portfolio consisted of "stated income verified assets and employment" or "reduced documentation employment verified" (collectively, "Limited Documentation") loans, and 9% consisted of no documentation ("No Documentation") loans. With respect to the Option ARM loans in the portfolio, only 12.4% were Full Documentation loans, while 56.3% were Limited Documentation loans, and the remaining 31.3% were No Documentation loans. In December 2005, federal bank regulators began expressing concerns about nontraditional loan products, including Option ARMs. Bank regulators were particularly concerned about Option ARMs based on reduced documentation, such as the No Documentation and Limited Documentation loans made by the Bank. Notwithstanding the concerns expressed by Bank Regulators, the Bank, under the auspices of Debtor BUFC (the holding company), continued to promote the origination of Option ARM loans throughout 2006 and part of 2007, often on a reduced documentation, or no documentation, stated income basis, and the Option ARM portfolio of the Bank continued to grow. By late 2006, the residential real estate markets in Florida, California, Nevada, and other markets where the Bank originated Option ARMs were declining.

US2008 2227176.11

Throughout 2007, the Bank's loan portfolio deteriorated significantly.  Nonperforming loans increased from $44.7 million for the quarter ending December 31, 2006, to $180.8 million for the quarter ending September 30, 2007.  The percentage of negatively amortizing loans also increased dramatically.  In response to continued deterioration in the Bank's Option ARM portfolio, on July 24, 2008, the OTS advised BUFC and the Bank that the Bank needed a capital infusion and/or to improve its various capital ratios.  BUFC entered into a Memorandum of Understanding  with the OTS on or about July 24, 2008, in which the OTS stated, "the deterioration in BUFC's nontraditional mortgage loan portfolio has caused the Bank, which represents the primary asset of the [Holding Company], to be in need of: (i) additional capital from [BUFC]; and (ii) certain other corrective actions."  The Memorandum of Understanding contemplated BUFC's board of directors would prepare and then implement a plan to raise at least $400 million in additional capital.  The OTS made clear that $400 million was the minimum the OTS would consider acceptable.  The Bank also entered into a separate Memorandum of Understanding with the OTS on or about July 24, 2008, in which the Bank agreed to achieve and maintain capital ratios at 8 percent core and 15 percent risk-based until the OTS agreed to relax those requirements.

On or about August 5, 2008, Debtor BUFC contributed $80 million in capital to the Bank.  On September 19, 2008, the OTS issued cease and desist orders to BUFC and the Bank in which it found, among other things, that BUFC had engaged in unsafe and unsound practices that resulted in the Bank being in an unsatisfactory condition, primarily because of rising delinquencies and defaults in its Option ARM portfolio.  The OTS continued to mandate that BUFC raise capital for the Bank and/or to improve its various capital ratios, and the OTS imposed restrictions on BUFC's use of existing capital.

16

For the first quarter ended December 31, 2007, second quarter ended March 31, 2008, and third quarter ended June 30, 2008, BUFC reported losses of $25.5 million, $65.8 million, and $117.7 million, respectively.  For the fourth quarter ended September 30, 2008, first quarter ended December 31, 2008, and second quarter ended March 31, 2009, BUFC reported preliminary losses of $327 million, $477.5 million, and $443.1 million, respectively.  In addition, as of March 31, 2009, the Bank had $1.98 billion in nonperforming loans, representing 19.4% of its total loan book, and had $154.2 million in repossessed property.  As of March 31, 2009, the Debtors' books and records reflected total liquid assets of approximately $21.2 million and total assets of approximately $73.6 million.

On April 14, 2009, the OTS issued a Prompt Corrective Action Directive ("PCA Directive") to the Bank.  The PCA Directive stated that: (1) the OTS notified the Bank on February 10, 2009 that it was critically undercapitalized as of January 30, 2009; (2) the OTS had considered and denied the Bank's Capital Plan as set forth in a letter to the Bank dated April 10, 2009; and (3) the Bank must be recapitalized by (a) merging with or being acquired by another financial institution, financial holding company, or other entity, or (b) the sale of all or substantially all of the Bank's assets and liabilities to another financial institution, financial holding company, or other entity within 20 days.  Following several unsuccessful efforts by BUFC to raise the Bank's capital ratios in accordance with mandates from the OTS, on May 21, 2009, the OTS closed the Bank and appointed the FDIC as receiver of the Bank for the purpose of liquidation or winding up the Bank's affairs (the "FDIC Receivership"), because, among other reasons, the Bank's liabilities exceeded its assets, the Bank was unable to meet its obligations to its creditors and others, and the Bank was in an unsafe and unsound condition to transact business.  Also on May 21, 2009, the FDIC entered into a Purchase and Assumption Agreement

with a group of investors who invested in a new depository institution, New Bank, for the purchase of the Bank.  Pursuant thereto, the FDIC transferred the Bank's assets and most liabilities to the New Bank.  All of the former officers and employees of the Bank then terminated their relationship with the Bank or the Debtors and either took positions at New Bank or pursued other opportunities.  In the aftermath of the closure of the Bank, BUFC's primary asset, on May 21, 2009, the Debtors filed their Chapter 11 petitions on May 22, 2009.

**B.    Debt Structure**

**1.    Senior Convertible Notes**

In February and March 2004, BUFC issued $120 million of senior convertible notes that mature in March 2034 and bear interest at an annual rate of 3.125% payable semiannually (the "Senior Convertible Notes").  These notes are senior unsecured obligations of BUFC.  U.S. Bank National Association is the Indenture Trustee for the Senior Convertible Notes.

**2.    HiMEDS Notes and Contract Adjustment Payments**

BUFC and The Bank of New York Mellon ("BNYM"), as successor in interest to The Bank of New York and as Indenture Trustee, entered into an indenture and a supplemental indenture pursuant to which BUFC issued $184 million in 6.37% senior notes due May 17, 2012 (the "HiMEDS Notes").  In connection therewith, BUFC and BNYM also entered into a purchase contract and pledge agreement (the "Purchase Contract and Pledge Agreement"), pursuant to which BUFC issued 3,680,000 HiMEDS units (the "HiMEDS Units").  Pursuant to the Purchase Contract and Pledge Agreement, each HiMEDS Unit had a stated amount of $50 and was comprised of two parts:  (a) a 5% interest in $1,000 principal amount of the HiMEDS Notes, and (b) a purchase contract which obligated the unit holder to purchase, and BUFC to sell, newly issued shares of BUFC Class A Common Stock on May 17, 2010, at a price varying with

18

the market price but not less than approximately $23 per share (the "Purchase Contract").  In accordance with the Purchase Contract and Pledge Agreement, the HiMEDS Notes were pledged as collateral to BNYM and held by it as collateral agent in order to secure the obligations of the holders of the HiMEDS Units under the Purchase Contracts to purchase Class A Common Stock of BUFC.

After the commencement of the Chapter 11 Cases, BUFC and BNYM entered into a stipulation which, subject to Bankruptcy Court approval of the same, granted relief from the automatic stay, to the extent applicable, to terminate the Purchase Contracts, extinguish the pledge of the HiMEDS Notes, and permit BNYM to release the HiMEDS Notes to the holders of the HiMEDS Units.  The Bankruptcy Court entered an order approving the stipulation and thereby modified the automatic stay, to the extent applicable, in accordance with the stipulation. Consistent with the order and the stipulation, BNYM released the HiMEDS Notes to the holders of the HiMEDS Units and their Purchase Contracts were terminated.

Pursuant to the Purchase Contract and Pledge Agreement, holders of HiMEDS Units were entitled to receive HiMEDS Contract Adjustment Payments from BUFC in respect of each Purchase Contract, in addition to payments of principal and interest in respect of the HiMEDS Notes.  The Committee understands that the HiMEDS Notes, in the principal amount of $184 million plus interest thereon, rank pari passu in terms of payment with the Senior Convertible Notes and the Junior Subordinated Debentures (which are discussed in the next paragraph).   On the other hand, the Committee understands that the HiMEDS Contract Adjustment Payments, in the sum of $184,511.11 as of the Petition Date, are subordinated in terms of payment to the Senior Notes (consisting of the Senior Convertible Notes, the HiMEDS Notes and the Junior Subordinated Debentures).  Thus, the Committee understands that the

US2008 2227176.11

HiMEDS Contract Adjustment Payments rank pari passu in terms of payment with the Trust Preferred Subordinated Debentures (which are discussed below).

### 3.    Junior Subordinated Debentures

On September 28, 2007, BUFC issued $12.5 million principal amount of floating rate junior subordinated debentures due on December 15, 2017 (the "Junior Subordinated Debentures").    Payment of principal and interest on these debentures was originally subordinated and junior in right of payment to the prior payment in full of all senior indebtedness of BUFC; however, the underlying indenture was modified and the subordination feature of these debentures was removed prior to the Debtors' Chapter 11 filings, and thus the Committee believes and understands that the Junior Subordinated Debentures are now pari passu with the Senior Convertible Notes and HiMEDS Notes in terms of payment.[6]    Wilmington Trust Company is the Indenture Trustee for the Junior Subordinated Debentures.

### 4.    Trust Preferred Subordinated Debentures

BUFC owns all of the common stock of various trusts.    Trust preferred securities, issued by these trusts, are held by investors.    Each of the trusts was formed for the purpose of issuing trust preferred securities and investing the proceeds from the sale thereof solely in junior subordinated debentures issued by BUFC, which in turn used the proceeds of the debentures for investment in the Bank or other corporate purposes.    From 2002 through 2007, BUFC issued trust preferred securities through its trust subsidiaries.    At the time of the Chapter 11 filings,

---

[6] The Committee understands that the Junior Subordinated Debentures were originally pari passu with the Trust Preferred Subordinated Debentures (discussed below) in terms of payment.    On information and belief, BUFC was able to defer interest payments due with respect to the Trust Preferred Subordinated Debentures; however, BUFC could only do this without triggering a default thereunder if it also deferred interest payments on any other pari passu debt, such as the Junior Subordinated Debentures.    However, the Indenture for the Junior Subordinated Debentures did not permit deferral of interest payments.    Accordingly, because BUFC desired to defer interest payments for the Trust Preferred Subordinated Debentures, the Committee understands that BUFC and Wilmington Trust Company modified the Indenture for the Junior Subordinated Debentures to make them pari passu in payment with the Senior Convertible Notes and the HiMEDS Notes.    Thus, BUFC was able to and did defer interest payments with respect to the Trust Preferred Subordinated Debentures without triggering a default thereunder.

US2008 2227176.11

BUFC had approximately $237 million in principal of subordinated debentures outstanding related to ten trust subsidiaries (the "Trust Preferred Subordinated Debentures"). The Committee understands that these Trust Preferred Subordinated Debentures, by their terms, are junior in payment to each of the Convertible Senior Notes, the HiMEDS Notes and the Junior Subordinated Debentures. The Committee also understands that each issuance of the Trust Preferred Subordinated Debentures is pari passu in payment with all of the other issuances of the Trust Preferred Subordinated Debentures and pari passu in payment with Claims related to the HiMEDS Contract Adjustment Payments. U.S. Bank National Association, Wilmington Trust Company, Wells Fargo Bank, National Association, and Law Debenture Trust Company of New York are the Indenture Trustees for the various Trust Preferred Subordinated Debentures.

### C.    Stock

BUFC has 10,000,000 authorized shares of Noncumulative Convertible Preferred Stock, Series B, with a par value of $0.01 per share. A total of 1,238,133 shares of BUFC's Noncumulative Convertible Preferred Stock, Series B, was issued and outstanding as of the Petition Date. BUFC also has 500,000,000 authorized shares of Class A Common Stock, with a par value of $0.01 per share. A total of 35,190,741 shares of Series I Class A Common Stock was issued and outstanding as of the Petition Date. BUFC also has 3,000,000 authorized shares of Class B Common Stock, with a par value of $0.01 per share. A total of 479,734 shares of Class B Common Stock was issued and outstanding as of the Petition Date. In addition, BUFC owns 100% of the issued and outstanding common stock of Debtors BUFS and CRE.

Prior to the Petition Date, BUFC's Class A Common Stock was publicly traded on the NASDAQ Global Select Market. BUFC was delisted from NASDAQ in 2009.

## III.    THE CHAPTER 11 CASES

The following is a general summary of some of the key matters and occurrences in connection with the Debtors' Chapter 11 Cases.

### A.    Early Stages of the Chapter 11 Cases

As previously noted, the Debtors filed their Chapter 11 petitions on May 22, 2009.  With no remaining officers and management after the Petition Date, BUFC's board of directors appointed Joseph J. Luzinski as Chief Restructuring Officer, effective as of June 2, 2009.

On May 29, 2009, the acting United States Trustee for Region 21 appointed the members of the Committee and filed an appropriate notice of appointment.  The members of the Committee are The Bank of New York Mellon (formerly The Bank of New York), in its capacity as Indenture Trustee; Wilmington Trust Company, in its capacity as Indenture Trustee; and Moses Marx, an individual holder of Senior Notes.  The Committee retained Kilpatrick Townsend & Stockton LLP as it counsel and Kozyak Tropin & Throckmorton, P.A. as its local counsel in connection with these Chapter 11 Cases.  The Committee also retained J.H. Cohn LLP as its financial advisors and forensic accountants.  Since its formation, the Committee and its advisors have played an active and important role in the Chapter 11 Cases.

To assist the Debtors in carrying out their duties as debtors in possession and to otherwise represent the Debtors' interests in these Chapter 11 Cases, the Bankruptcy Court approved the employment of Greenberg Traurig as the Debtors' general bankruptcy counsel.  The Bankruptcy Court also approved the Debtors' retention of Development Specialists, Inc. ("DSI") to provide restructuring management services and Mr. Luzinski of DSI as the Debtors' Chief Restructuring Officer (the "CRO").  The Bankruptcy Court has also approved the retention of Epiq Bankruptcy Solutions, LLC as noticing and balloting agent in connection with these Chapter 11 Cases.

The Debtors filed their schedules and statement of financial affairs with the Bankruptcy Court on August 10, 2009. The first meeting of creditors of the Debtors pursuant to section 341 of the Bankruptcy Code was held on September 10, 2009.

The Bankruptcy Court entered an order establishing November 17, 2009 as the bar date for all creditors of the Debtors to file proofs of claim in these Chapter 11 Cases.

The Debtors, New Bank, and the FDIC each recognized that it would be impractical to immediately separate each of their respective documents from each of the others' documents, and that among their respective documents are documents that may be subject to various privileges and immunities, which none of the parties intended to waive. Accordingly, the parties entered into an information access agreement (the "Information Access Agreement") to implement procedures providing each party with appropriate access to such documents, while preserving privileges and minimizing expenses and delays that could be incurred as a result of any disputes over the documents. The Debtors filed a motion to approve the Information Access Agreements, which the Bankruptcy Court approved.

The Debtors have incurred significant net operating losses ("NOLs"). A critical element in preserving the NOLs for use by the Debtors in the future is the prevention of an "ownership change" of the Debtors for tax purposes. Thus, in an effort to preserve and maximize the use of the Debtors' NOLs, the Debtors filed a motion requesting that the Bankruptcy Court establish procedures and restrictions related to trading in BUFC's equity securities and the HiMEDS Units in order to protect the potential value of BUFC's consolidated NOL carryforwards and certain other tax attributes. The Bankruptcy Court granted this motion.

Debtor BUFC's primary assets now consist of approximately $9.6 million in cash, as reported in the Debtors' consolidated monthly operating report for the period ending February

US2008 2227176.11

28, 2011 (the "February 2011 MOR"), as well as litigation claims, tax attributes and investments in subsidiaries and non-subsidiaries, including investments in Malta Hedge Fund II, LP and SOAM Capital Partners, LP with a combined market value of approximately $1.34 million, as reflected in the February 2011 MOR. In addition, BU Realty Corporation, which is a non-debtor and is a wholly-owned subsidiary of BUFC, has approximately $29,000 in a bank account, as reflected in the February 2011 MOR. In addition, BUFC's schedules reflect that it is owed an intercompany receivable with a book value of approximately $3.4 million by Debtor BUFS.

The primary asset of Debtor BUFS is approximately $2.1 million in cash, as reported in the February 2011 MOR. BUFS also listed in its schedules filed with the Bankruptcy Court a receivable in an unknown amount from LPL Financial Corporation. The Committee understands that this receivable relates to commissions owed to BUFS in the approximate sum of $100,000 from the sale of financial planning products and advisory services. The Committee is seeking to obtain more information about this particular asset and expresses no opinion at this time as to the value of this potential asset.

The primary asset of Debtor CRE is a time share interest (the "Time Share") that it holds in the Fifth and Fifty-Fifth Residence Club, a/k/a St. Regis Residence Club New York (the "Residence Club"), located in New York City, New York. The Time Share consists of four weeks use of a two-bedroom suite at the Residence Club. By order entered April 1, 2010, the Bankruptcy Court approved CRE's retention of The Corcoran Group ("Corcoran") as a real estate broker to market, sell, or rent the Time Share at the Residence Club, with such retention to continue until July 14, 2010. In connection therewith, Corcoran was authorized to offer the Time Share for sale for $550,000, subject to Bankruptcy Court approval and higher and better offers. CRE listed the value of the Time Share on its schedules as $578,449. The Time Share has not

yet been sold and Corcoran's retention as real estate broker expired on July 14, 2010. In addition to the Time Share, CRE has approximately $216,000 in cash, as reported in the February 2011 MOR.

The Debtors' assets also include certain directors and officers liability insurance policies which provide a total of $20 million in coverage for acts occurring prior to November 10, 2008, and an additional total of $30 million in coverage for acts occurring on or after November 10, 2008 (collectively, the "D&O Policies"). Under the D&O Policies, claims sufficient to trigger coverage must have been asserted prior to expiration of the respective extended reporting periods, which may have been as early as November 10, 2009 (the "Claims Made Deadline").

### B.    Tax Attributes

In September 2009, BUFC filed an amended consolidated federal corporate income tax return for its fiscal year 2007 (the "Amended FY 2007 Return"). In connection with filing the Amended FY 2007 Return, BUFC claimed a refund of $5,566,878 (the "2007 Refund Claim"). The 2007 Refund Claim has been approved by the Joint Congressional Committee on Taxation but has not yet been received by BUFC.

On June 14, 2010, BUFC filed its fiscal year 2008 consolidated federal corporate income tax return (the "FY 2008 Return") which reported a net operating loss of $3,752,688,436 (the "NOL"). In connection with its FY 2008 Return, BUFC also filed a Form 1139 application to carry back $129,209,049 of the NOL, thereby claiming a refund of $42,552,226 for taxes paid in fiscal years 2003, 2005, and 2006. In August 2010, BUFC received correspondence from the Internal Revenue Service ("IRS") rejecting the refund claim that BUFC had submitted on an IRS Form 1139 because it did not include the signature of the FDIC, in its capacity as receiver for the Bank. In order to avoid any further delay in the process of attempting to obtain these tax refunds, in October 2010, BUFC filed with the IRS three amended U.S. Corporation Income Tax

Return Forms 1120X[7] for fiscal years 2003, 2005, and 2006, seeking total refunds in the sum of $44,815,082[8] (the "2003, 2005 and 2006 Refund Claims," and with the 2007 Refund Claim, the "Refund Claims").  As with the 2007 Refund Claim, the Joint Congressional Committee on Taxation must also approve the refund claim related to the FY 2008 Return.

Both the Debtors and the FDIC, on behalf of the Bank, claim an interest in any tax refunds received as a result of the Refund Claims which aggregate in excess of $50 million (the "Tax Refunds").  Pending a resolution of these competing claims, the Debtors and the FDIC entered into a stipulation pursuant to which they agreed that the Tax Refunds will be collected and placed in a segregated bank account, without prejudice to either party's position, in order to permit interest to accrue thereon while determination regarding ownership of the Tax Refunds is being resolved (the "Tax Escrow Stipulation").  On November 25, 2009, the Bankruptcy Court entered an order approving the Tax Escrow Stipulation.  BUFC has not yet received any Tax Refunds related to the Refund Claims discussed above.  When any such Tax Refunds are received, they will be deposited and held in an escrow account in accordance with the Tax Escrow Stipulation.

The FDIC filed a motion with the Bankruptcy Court seeking a determination either that the automatic stay does not apply, or alternatively, requesting relief from the automatic stay so that the FDIC can file its own competing claim for a Tax Refund and/or a loss return for fiscal year 2008, file amendments to prior years' tax returns, and take certain other actions related to Tax Refunds.  The Debtors and the Committee opposed the FDIC's motion.  The Bankruptcy

---

[7] The FDIC's signature, in its capacity as receiver for the Bank, is not required on the Forms 1120X that BUFC filed.

[8] The refund amount sought is approximately $2.262 million more than BUFC sought originally in the Form 1139 from June 14, 2010.  This is based on IRS Notice 2010-58, 2010-37 IRB, issued on August 20, 2010, which allowed BUFC to seek a refund of 100% of the alternative minimum taxable income for the prior years, rather than 90% in accordance with the IRS' original position on this issue that was in effect at the time the Form 1139 was filed in June 2010.

Court conducted a hearing on that motion in October 2010 and took the matter under advisement. The Debtors and the FDIC requested that the Bankruptcy Court withhold ruling on the motion because of the possibility of a settlement that would involve, among other things, the FDIC's stay relief motion. However, as of the time of filing hereof, no such resolution has been reached.

For several months, the Debtors and the Committee have been in discussions with various potential transaction partners who would take advantage of the Debtors' substantial NOL carryforwards. While those discussions continue, no such transaction has been agreed upon thus far. The Debtors and the Committee will continue to explore various options related thereto and if a transaction can be agreed upon, then the Plan and this Disclosure Statement will be amended accordingly or withdrawn in favor of a Plan that would contemplate such a transaction.

### C.    Litigation

#### 1.    Debtors' Litigation

The Debtors have filed a complaint in the Bankruptcy Court against the FDIC (the "FDIC Litigation"). In this complaint, the Debtors are seeking a determination that certain tax attributes, including the Refund Claims for more than $50 million that were discussed above, are property of BUFC's bankruptcy Estate. In their complaint, the Debtors have also objected to the proofs of claim filed by the FDIC in these Chapter 11 Cases for in excess of $1 billion and have also requested the allowance of more than $414 million in claims asserted by the Debtors and a non-debtor subsidiary against the Bank in connection with the FDIC Receivership. In its capacity as receiver for the Bank, the FDIC filed proofs of claim in each of the Debtors' Chapter 11 Cases, which, as originally filed, appeared to be identical in all material respects (the "FDIC Proofs of Claim"). Pursuant thereto, the FDIC asserts Claims against the Debtors in an unliquidated amount, but which the FDIC contends will be in excess of $1 billion. Among the Claims the FDIC asserts in the FDIC Proofs of Claim are Claims in the amount of $48,119,104

27

pursuant to a December 31, 1997 income tax allocation agreement between BUFC and the Bank (the "Tax Sharing Agreement"), which Claims the FDIC asserts should be allowable to the extent BUFC, rather than the FDIC, in its capacity as receiver for the Bank, is determined to own the Tax Refunds.

The FDIC also asserts Claims against Debtor BUFC under section 365(o) of the Bankruptcy Code in an amount not less than $1.467 billion, as a section 507(a)(9) priority Claim (which if ultimately Allowed must be paid in full before creditors of BUFC with General Unsecured Claims can receive any payments), for alleged failure by BUFC of a purported commitment to maintain adequate capitalization of the Bank.  The FDIC failed to attach any documentation to the FDIC Proofs of Claim to support this alleged commitment by BUFC to maintain adequate capitalization of the Bank, and BUFC is vigorously opposing the FDIC's position that sections 365(o) and 507(a)(9) of the Bankruptcy Code apply in these Chapter 11 Cases.  Moreover, the Committee has reviewed what it understands to be all of the agreements which BUFC entered into with various regulatory agencies.  Based on its review and analysis of these various agreements, the Committee believes a very strong argument can be made that the FDIC cannot establish that BUFC made any commitment to maintain adequate capitalization of the Bank, and thus sections 365(o) and 507(a)(9) of the Bankruptcy Code should be inapplicable in these Chapter 11 Cases.  In the FDIC Proofs of Claim as originally filed, the FDIC also asserted section 365(o) and section 507(a)(9) priority Claims against Debtors BUFS and CRE.  However, the FDIC later amended those Claims so that it is no longer asserting these priority Claims against BUFS and CRE.

The FDIC also asserts Claims against the Debtors in an undetermined amount for "Tort-Based/Insurance Proceeds Claims."  The Debtors seek disallowance of the entirety of the

FDIC Proofs of Claim in the FDIC Litigation.  If and to the extent that the Debtors ultimately prevail in the FDIC Litigation with respect to the Tax Refunds and it is determined that the Tax Refunds in excess of $50 million are property of BUFC's Estate and thus should be paid to BUFC, then the FDIC will likely have a valid general unsecured nonpriority Claim against BUFC for a significant portion of the amount of such Tax Refunds.  However, that Claim of the FDIC would then be subject to potential reduction based on various offsets available to the Debtors, as discussed in the next paragraph.

The Debtors filed proofs of claim for in excess of $414 million against the Bank in connection with the FDIC Receivership.  Pursuant thereto, various types of claims are asserted, including but not limited to, claims for (i) amounts due to the Debtors from the Bank for Tax Refunds pursuant to the Tax Sharing Agreement, (ii) reimbursement, contribution, and subrogation guaranties given by BUFC for performance by the Bank under various contracts or satisfaction of obligations of the Bank, (iii) intercompany advances, (iv) fraudulent transfers and preferences made by the Debtors to or for the benefit of the Bank, and (v) indemnification, contribution, and reimbursement claims against the Bank for acts of omissions of the Bank and its subsidiaries.  The Debtors are seeking the allowance of these FDIC Receivership claims in the FDIC Litigation.  The FDIC Litigation is pending in the Bankruptcy Court and the ultimate outcome is uncertain.  The Committee believes that these claims asserted by the Debtors in the FDIC Receivership, if allowed, would likely be beneficial to the Debtors in providing an offset against any Allowed Claims of the FDIC in the Chapter 11 Cases, but that an affirmative recovery by the Debtors on such claims from the FDIC Receivership estate is unlikely because of the statutory treatment of these claims, which subordinates such claims to claims of depositors of the failed bank or the FDIC, in its corporate capacity as subrogee for such claims.

In addition to seeking allowance of the Debtors' FDIC Receivership claims in the FDIC Litigation pending in the Bankruptcy Court, BUFC filed a complaint against the FDIC in the District Court seeking allowance of such claims.  BUFC filed a summary judgment motion with the District Court related to the FDIC Receivership claims, which the District Court denied. BUFC has appealed that denial of summary judgment to the Eleventh Circuit Court of Appeals, where that appeal is currently pending.

### 2.    Committee's Litigation

Based on the Debtors' financial collapse and information obtained by its professionals, the Committee believed that claims on behalf of the Debtors' bankruptcy estates existed against certain of the Debtors' current and former officers and directors (collectively, the "Insiders").  The claims include those arising from breaches of duties owed by the Insiders to the Debtors or their constituents, misrepresentations, failures to disclose, and other wrongful acts and negligence committed by the Insiders.  Because the Insiders could not be expected to cause the Debtors to investigate or pursue such claims against themselves, on August 31, 2009, the Committee filed a motion for derivative standing in order to investigate, assert, and prosecute claims against officers, directors, and professionals of the Debtors.  The Bankruptcy Court entered an order (the "Derivative Standing Order") in which it granted the Committee derivative standing on behalf of the Debtors' estates, and the exclusive right, to investigate, and if warranted, assert and pursue all claims that are property of the Debtors' estates against Insiders and the law firm of Camner Lipsitz, P.A. (which law firm represented the Debtors on a prepetition basis and is also the law firm founded by Alfred Camner, the Debtors' former Chief Executive Officer) or any of its present or former members.  In the Derivative Standing Order, the Bankruptcy Court also provided that the Debtors (rather than the Committee) would commence an investigation regarding the viability of any claims against prepetition professionals

of the Debtors (other than Camner Lipsitz, P.A.) and apprise and consult with the Committee about actions taken in connection therewith.   The Committee subsequently filed and served notices of Rule 2004 examinations on several Insiders (specifically certain former officers and directors of the Debtors), as well as certain attorneys employed by Camner Lipsitz, P.A. Pursuant to the Rule 2004 notices, the Committee requested the production of various documents relevant to its investigation and conducted examinations of certain Insiders.   On November 5, 2009, in order to comply with the Claims Made Deadlines in the D&O Policies, the Committee issued demand letters to certain Insiders providing notice of possible claims against them on behalf of BUFC's bankruptcy estate for acts or omissions in their capacities as executive officers of BUFC or in their capacities as directors of BUFC (the "Demand Letters").

The FDIC subsequently filed a motion in which it argued that the claims described in the Demand Letters were derivative claims within the exclusive purview of the FDIC, rather than claims that the Committee could legally assert on behalf of the Debtors.   The FDIC contended that the Committee violated the Derivative Standing Order and should be prohibited from continuing its investigation, assertion, and prosecution of the claims asserted in the Demand Letters.   The Bankruptcy Court determined that the Committee did not violate the Derivative Standing Order and thus entered an order (the "Second Derivative Standing Order") denying the FDIC's motion, which order was appealed by the FDIC.

The   Committee   subsequently   filed   a   declaratory   judgment   action   in   the Bankruptcy Court against the FDIC in which it sought a determination from the Bankruptcy Court that the claims set forth in a proposed form of complaint (the "Proposed Complaint") attached to the complaint initiating the declaratory judgment action constitute property of the estate of Debtor BUFC under section 541 of the Bankruptcy Code and that the Committee, thus,

has standing to bring such claims on behalf of the Estate. Shortly after the filing of the declaratory judgment action, the FDIC dismissed its appeal of the Second Derivative Standing Order.

The claims set forth in the Proposed Complaint assert that BUFC's former Chief Executive Officer, Alfred R. Camner, and former Chief Financial Officer, Humberto L. Lopez, breached their fiduciary duties to BUFC as senior executive officers of BUFC. Specifically, Count I seeks recovery against Messrs. Camner and Lopez for breach of their fiduciary duties of care to BUFC by failing to, among other things, exercise vigilant control over and attention to the financial accounting and reporting of BUFC. Count II seeks recovery from Camner and Lopez for failing to provide complete and accurate disclosures to the board of BUFC regarding the financial condition of BUFC and its subsidiaries. Finally, Count III asserts a claim against Camner based on his failure to provide the BUFC board of directors with the information it needed to determine if a capital contribution of $80 million made by BUFC to the Bank on August 5, 2008 was in the best interests of BUFC. In November 2010, the Bankruptcy Court entered an order in the declaratory judgment action on competing summary judgment motions filed by the Committee and the FDIC. The Bankruptcy Court concluded that Counts I and Count III of the Proposed Complaint constitute derivative claims that belong to the FDIC (on behalf of the Bank) and may not be pursued by the Committee on behalf of Debtor BUFC. The Bankruptcy Court also concluded that Count II of the Proposed Complaint constitutes a direct claim of BUFC that may be pursued by the Committee on behalf of Debtor BUFC. The Committee has appealed the Bankruptcy Court's rulings with respect to Counts I and III of that order and the FDIC has filed a cross-appeal with respect to Count II of that order, which appeal is currently pending.

US2008 2227176.11

**D.      Exclusivity**

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptances of a chapter 11 plan for an initial period of 120 days from the date on which the debtor filed for voluntary relief.  If the debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the date on which the debtor filed for voluntary relief to solicit acceptances to the plan.  During these exclusive periods, no other party in interest may file a competing plan.  However, a court may extend these periods upon request of a party in interest and "for cause."   The Debtors filed several motions to extend exclusivity in these Chapter 11 Cases, which the Bankruptcy Court granted.   The Bankruptcy Court granted the Debtors a final extension through and including November 22, 2010 of the exclusive period to file a plan and a final extension through and including January 22, 2011 of the exclusive period within which to solicit and obtain acceptances of a plan.  The Debtors' exclusivity periods have now expired.  As a result, the Committee has filed its Plan.

**IV.      SUMMARY OF THE PLAN**

      **A.      Administrative and Priority Tax Claims**

            **1.      Administrative Claims**

The Plan provides that, subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, the Debtors, Liquidating BankUnited or the Plan Administrator, as applicable, shall pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash: (i) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (ii) if such Claim is Allowed after the Effective Date, on the date such

US2008 2227176.11

Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due); (iii) at such later time as may be agreed upon by such Holder and Liquidating BankUnited or the Plan Administrator, as applicable; or (iv) at such time and upon such terms as set forth in an order of the Bankruptcy Court.  All payments of Allowed Administrative Claims shall be allocated among each of the Debtors based on the nature of the work performed.  The Plan establishes an Administrative Claim Bar Date that is the first Business Day thirty days after the Effective Date as the deadline for a Holder of an Administrative Claim to file a request with the Bankruptcy Court for payment of such Administrative Claim.  The Plan defines Effective Date as meaning the first Business Day after the Bankruptcy Court enters an order confirming the Plan (the "Confirmation Order") on which: (a) no stay of such Confirmation Order is in effect, and (b) all of the conditions precedent set forth in Article VIII.B of the Plan have either been satisfied or waived.

### 2.        Priority Tax Claims

The Plan further provides that Liquidating BankUnited or the Plan Administrator, as applicable, shall pay each Holder of an Allowed Priority Tax Claim the full unpaid amount of such Allowed Priority Tax Claim in Cash, on or as soon as practicable after the latest of: (i) the Effective Date; (ii) the date such Allowed Priority Tax Claim becomes Allowed; and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law.  All payments of Allowed Priority Tax Claims shall be allocated to the Debtor's Estate against which such Priority Tax Claim was Allowed.

### B.        Classification and Treatment of Claims and Interests

### 1.        Summary

The Plan constitutes a chapter 11 plan for each of the Debtors, BUFC, BUFS, and CRE.  Except for Administrative Claims and Priority Tax Claims, all Claims against and

34

Interests in each of the Debtors are placed in Classes. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims or Priority Tax Claims. In addition, these Chapter 11 Cases have been consolidated for administrative purposes only. No substantive consolidation of the Debtors has been sought or is otherwise proper. The treatment for each Claim set forth below identifies the particular Estate from which such Claim is to be satisfied. The assets of each Estate shall be used to satisfy only the Claims of that Estate and shall not be used to satisfy or otherwise reduce the Claims of any other Estate.

The charts shown below classify Claims against and Interests in each of the Debtors for all purposes, including voting, confirmation and Distribution pursuant to the Plan and sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class, other than for voting purposes, only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date of the Plan.

**2.      Summary of Classified Claims and Interests of BUFC**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | BUFC Secured Claims | Unimpaired | No (deemed to accept) |
| 2 | Non-FDIC Priority Claims | Unimpaired | No (deemed to accept) |
| 3 | FDIC Priority Claims | Impaired | Yes |
| 4 | Senior Notes Claims | Impaired | Yes |
| 5 | BUFC General Unsecured Claims | Impaired | Yes |
| 6 | Subordinated Notes Claims | Impaired | Yes |
| 7 | BUFC Preferred Stock Interests | Impaired | No (deemed to reject) |
| 8 | BUFC Common Stock Interests | Impaired | No (deemed to reject) |

US2008 2227176.11

3. **Summary of Classified Claims and Interests of BUFS**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | BUFS Secured Claims | Unimpaired | No (deemed to accept) |
| 2 | BUFS General Unsecured Claims | Impaired | Yes |
| 3 | BUFS Stock Interests | Impaired | Yes |

4. **Summary of Classified Claims and Interests of CRE**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | CRE General Unsecured Claims | Impaired | Yes |
| 2 | CRE Stock Interests | Impaired | Yes |

5. **Classification and Treatment of Claims and Interests of BUFC**

Class 1—BUFC Secured Claims

(a)     Classification:  Class 1 consists of all BUFC Secured Claims.

(b)     Impairment and Voting:  Class 1 is Unimpaired by the Plan.  Each Holder of a BUFC Secured Claim is presumed to accept and therefore is not entitled to vote to accept or reject the Plan.

(c)     Treatment:  Except to the extent that a Holder of a BUFC Secured Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each BUFC Secured Claim, each Holder of an Allowed BUFC Secured Claim shall, at the sole option of BUFC (with the consent of the Committee), Liquidating BankUnited or the Plan Administrator, as applicable: (i) be paid in full in Cash, (ii) receive the collateral securing its Allowed BUFC Secured Claim, plus postpetition interest to the extent required under section 506(b) of the Bankruptcy Code, or (iii) receive other treatment rendering such BUFC Secured Claim Unimpaired, in each case on the later of the Effective Date and the date such BUFC Secured Claim becomes an Allowed BUFC Secured Claim, or as soon as practicable thereafter.

US2008 2227176.11

Class 2—BUFC Non-FDIC Priority Claims

(a)      Classification:  Class 2 consists of all BUFC Non-FDIC Priority Claims.

(b)      Impairment and Voting:  Class 2 is Unimpaired by the Plan.  Each Holder of a BUFC Non-FDIC Priority Claim is presumed to accept and therefore is not entitled to vote to accept or reject the Plan.

(c)      Treatment:  On or as soon as practicable after the Effective Date, Liquidating BankUnited or the Plan Administrator, as applicable, shall pay each Holder of an Allowed BUFC Non-FDIC Priority Claim, in full and final satisfaction of such Allowed BUFC Non-FDIC Priority Claim, Cash equal to the full amount of its Claim, unless the Holder otherwise agrees to less favorable treatment, on or as soon as practicable after the latest of: (i) the Effective Date; (ii) the date such Allowed BUFC Non-FDIC Priority Claim becomes Allowed; and (iii) the date such Allowed BUFC Non-FDIC Priority Claim is payable under applicable non-bankruptcy law.

Class 3—BUFC FDIC Priority Claims

(a)      Classification:  Class 3 consists of all BUFC FDIC Priority Claims.

(b)      Impairment and Voting:  Class 3 is Impaired by the Plan.  Each Holder of a Claim that, if Allowed, would constitute a BUFC FDIC Priority Claim, is entitled to vote to accept or reject the Plan.

(c)      Treatment:  In full satisfaction, settlement, release and compromise of and in exchange for each BUFC FDIC Priority Claim, Liquidating BankUnited or the Plan Administrator, as applicable, shall pay each Holder of an Allowed BUFC FDIC Priority Claim on the Initial Distribution Date and each Quarterly Distribution Date thereafter all Net Free Cash[9] as

---

[9] Net Free Cash is determined, maintained, and distributed on a Debtor by Debtor basis with respect to each of BUFC, BUFS, and CRE.  Net Free Cash is the amount of Cash after full payment or satisfaction of, or appropriate reserve for Allowed Secured, Administrative, Priority Tax, and Non-FDIC Priority Claims; the costs of

such Net Free Cash is available on such distribution date until the Allowed BUFC FDIC Priority Claim is paid in full.  The Plan states that the Initial Distribution Date shall be a date selected by the Plan Administrator as soon as reasonably practicable after the Effective Date.  In accordance with the Plan, the Distribution available to holders of Allowed BUFC FDIC Priority Claims shall be limited by the value of BUFC's Assets after satisfaction of any Allowed BUFC Secured Claims and any Allowed BUFC Non-Priority Claim.

Class 4—Senior Notes Claims

(a)    Classification:  Class 4 consists of all Senior Notes Claims, which means General Unsecured Claims arising from or relating to the Senior Convertible Notes, the HiMEDS Notes and the Junior Subordinated Debentures.

(b)    Impairment and Voting:  Class 4 is Impaired by the Plan.  Each Holder of a Claim that, if Allowed, would constitute a Senior Notes Claim, is entitled to vote to accept or reject the Plan.

(c)    Allowance:  In accordance with the Plan, the Senior Notes Claims shall be Allowed in the aggregate amount of $320,537,238.89, comprised of:  (a) $120,843,750.00 on account of the Senior Convertible Notes, (b) $187,092,988.89 on account of the HiMEDS Notes (but not including the HiMEDS Contract Adjustment Payments); and (c) $12,600,500.00 on account of the Junior Subordinated Debentures.  The Plan provides that Allowed Senior Notes Claims shall not be subject to any reductions, setoff, recharacterization, subordination (equitable, contractual or otherwise), counterclaim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation, provided, however, that nothing set forth in the Plan is intended to waive, release or otherwise compromise avoidance actions, if any, arising

---

administering and implementing the Plan; and ordinary business expenses of the Plan Administrator and the Wind Down.

under chapter 5 of the Bankruptcy Code, or objections, if any, to Senior Notes Claims pursuant to section 502(d) of the Bankruptcy Code.

(d)    Treatment:   In full satisfaction, settlement, release, and compromise of and in exchange for each Senior Notes Claim, each Holder of an Allowed Senior Notes Claim shall receive on the Initial Distribution Date and each Quarterly Distribution Date thereafter a Pro Rata Distribution of Residual Net Free Cash[10] as such Residual Net Free Cash is available on such distribution date.  In addition, each Holder of an Allowed Senior Notes Claim shall be entitled to receive on account of such Allowed Senior Notes Claim redistributions of Residual Net Free Cash from the Subordinated Indenture Trustees pursuant to the subordination provisions of the relevant Indentures.  The relative priorities among holders of Allowed Senior Notes Claims and Allowed Subordinated Notes Claims, and the order in which such Holders are entitled to receive payment of their Allowed Claims, are governed by the relevant Indentures, and nothing in the Plan is intended to or shall conflict with the contractual subordination and subrogation provisions of such Indentures, which shall govern and shall be enforced pursuant to section 510(a) of the Bankruptcy Code.

Class 5—BUFC General Unsecured Claims

(a)    Classification:  Class 5 consists of all BUFC General Unsecured Claims, which means a General Unsecured Claim against BUFC that is not a Senior Notes Claim or a Subordinated Notes Claim.

(b)    Impairment and Voting:  Class 5 is Impaired by the Plan.  Each Holder of a Claim that, if Allowed, would constitute a BUFC General Unsecured Claim, is entitled to vote to accept or reject the Plan.

---

[10] Residual Net Free Cash is the Net Free Cash available for any particular Debtor after paying such Debtor's Allowed FDIC Priority Claims, if any, in full.

(c)        Treatment:  In full satisfaction, settlement, release, and compromise of and in exchange for each BUFC General Unsecured Claim, each Holder of an Allowed BUFC Unsecured Claim shall receive on the Initial Distribution Date and each Quarterly Distribution Date thereafter a Pro Rata Distribution of Residual Net Free Cash as such Residual Net Free Cash is available on such distribution date.

Class 6—Subordinated Notes Claims

(a)        Classification:  Class 6 consists of all Subordinated Notes Claims, which means General Unsecured Claims arising from or relating to the Trust Preferred Subordinated Debentures and the HiMEDS Contract Adjustment Payments.

(b)        Impairment and Voting:  Class 6 is Impaired by the Plan.  Each holder of a Claim that, if Allowed, would constitute a Subordinated Notes Claim in Class 6 is entitled to vote to accept or reject the Plan.

(c)        Allowance:  The Subordinated Notes Claims shall be Allowed in the aggregate amount of $245,116,005.78, which is comprised of (a) $184,511.11 on account of the HiMEDS Contract Adjustment Payments; (b) $26,735,411.20 on account of the Statutory Trust III Debentures; (c) $21,393,239.18 on account of the Statutory Trust IV Debentures; (d) $16,026,577.42 on account of the Statutory Trust V Debentures; (e) $18,835,308.57 on account of the Statutory Trust VI Debentures; (f) $16,191,720.84 on account of the Statutory Trust VII Debentures;  (g) $15,892,918.31 on account of the Statutory Trust VIII Debentures; (h) $16,091,320.63 on account of the Statutory Trust IX Debentures; (i) $52,917,633.98 on account of the Statutory Trust X Debentures; (j) $52,915,053.35 on account of the Statutory Trust XI Debentures; and (k) $7,932,311.19 on account of the Statutory Trust XII Debentures.  In accordance with the Plan, and except as provided in Article V.O of the Plan which deals with

contractual subordination rights, the Allowed Subordinated Notes Claims shall not be subject to any reductions, setoff, recharacterization, subordination (equitable, contractual or otherwise), counterclaim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation, provided, however, that nothing set forth in the Plan is intended to waive, release or otherwise compromise avoidance actions, if any, arising under chapter 5 of the Bankruptcy Code, or objections, if any, to Subordinated Notes Claims pursuant to section 502(d) of the Bankruptcy Code.

(d)    Treatment:  In full satisfaction, settlement, release, and compromise of and in exchange for each Subordinated Notes Claim, each Holder of an Allowed Subordinated Notes Claim shall receive on the Initial Distribution Date and each Quarterly Distribution Date thereafter a Pro Rata Distribution of Residual Net Free Cash as such Residual Net Free Cash is available on such distribution date, provided, however, that any Distribution to Holders of Allowed Subordinated Notes Claims of Residual Net Free Cash shall be redistributed, subject to Bankruptcy Rule 3021 and subject to any lien or priority rights of the Subordinated Indenture Trustees, pursuant to the subordination provisions of the relevant Indentures.  The relative priorities among holders of Allowed Senior Notes Claims and Allowed Subordinated Notes Claims, and the order in which such Holders are entitled to receive payment of their Allowed Claims, are governed by the relevant Indentures, and nothing in the Plan is intended to or shall conflict with the contractual subordination and subrogation provisions of such Indentures, which shall govern and shall be enforced pursuant to section 510(a) of the Bankruptcy Code.

Class 7—BUFC Preferred Stock Interests

(a)    Classification:  Class 7 consists of all BUFC Preferred Stock Interests.

(b)    Impairment and Voting:  Class 7 is Impaired by the Plan.  Each Holder of a BUFC Preferred Stock Interest in Class 7 is conclusively presumed to reject the Plan and is not entitled to vote to accept or reject the Plan.

(c)    Treatment:  No Holder of BUFC Preferred Stock Interests shall receive any Distribution.  The BUFC Preferred Stock Interests in Class 7 shall be deemed transferred to the Plan Administrator as of the Effective Date.  As set forth in the Plan, immediately thereafter such BUFC Preferred Stock Interests shall be deemed cancelled, terminated and of no further force or effect.

Class 8—BUFC Common Stock Interests

(a)    Classification:  Class 8 consists of all BUFC Common Stock Interests.

(b)    Impairment and Voting:  Class 8 is Impaired by the Plan.  Each Holder of a BUFC Common Stock Interest in Class 8 is conclusively presumed to reject the Plan and is not entitled to vote to accept or reject the Plan.

(c)    Treatment:  No Holder of BUFC Common Stock Interests shall receive any Distribution.  The BUFC Common Stock Interests in Class 8 shall be deemed transferred to the Plan Administrator as of the Effective Date.  Immediately thereafter, such BUFC Common Stock Interests shall be deemed cancelled, terminated and of no further force or effect.

### 6.    Classification and Treatment of Claims and Interests of BUFS

Class 1—BUFS Secured Claims

(a)    Classification:  Class 1 consists of all BUFS Secured Claims.

(b)    Impairment and Voting:  Class 1 is Unimpaired by the Plan.  Each Holder of a BUFS Secured Claim is presumed to accept and therefore is not entitled to vote to accept or reject the Plan.

US2008 2227176.11

(c)     Treatment:  Except to the extent that a Holder of a BUFS Secured Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each BUFS Secured Claim, each Holder of an Allowed BUFS Secured Claim shall, at the sole option of Debtor BUFS (with the consent of the Committee), Liquidating BankUnited or the Plan Administrator, as applicable: (i) be paid in full in Cash, (ii) receive the collateral securing its Allowed BUFS Secured Claim, plus postpetition interest to the extent required under section 506(b) of the Bankruptcy Code, or (iii) receive other treatment rendering such BUFS Secured Claim Unimpaired, in each case on the later of the Effective Date and the date such BUFS Secured Claim becomes an Allowed BUFS Secured Claim, or as soon as practicable thereafter.

Class 2—BUFS General Unsecured Claims

(a)     Classification:  Class 2 consists of all BUFS General Unsecured Claims.

(b)     Impairment and Voting:  Class 2 is Impaired by the Plan.  Each Holder of a Claim that, if Allowed, would constitute a BUFS General Unsecured Claim in Class 2 is entitled to vote to accept or reject the Plan.

(c)     Treatment:   In full satisfaction, settlement, release, and compromise of and in exchange for each BUFS General Unsecured Claim, each Holder of an Allowed BUFS General Unsecured Claim shall receive on the Initial Distribution Date and each Quarterly Distribution Date thereafter a Pro Rata Distribution of Residual Net Free Cash as such Residual Net Free Cash is available on such distribution date.  The Pro Rata Distribution available to holders of Allowed BUFS General Unsecured Claims shall be limited by the value of BUFS's assets.

Class 3—BUFS Stock Interests

(a)     Classification:  Class 3 consists of all BUFS Stock Interests.

43

(b)        Impairment and Voting:  Class 3 is Impaired by the Plan.  BUFC, as sole Holder of the BUFS Stock Interests in Class 3, is entitled to vote to accept or reject the Plan.

(c)        Treatment:  If, and only if, Residual Net Free Cash remains in BUFS after satisfaction of all Allowed Claims against BUFS, BUFC, as sole holder of the BUFS Stock Interests, shall receive a Distribution of all remaining Residual Net Free Cash of BUFS and any other assets comprising the BUFS Estate.  If no Residual Net Free Cash remains in BUFS after satisfaction of all Allowed Claims against BUFS, then, on the earliest date following the Effective Date upon which a determination can be made that no Residual Net Free Cash remains in BUFS, all BUFS Stock Interests shall be deemed transferred to the Plan Administrator.  As set forth in the Plan, immediately after any and all Residual Net Free Cash of BUFS is distributed, such BUFS Stock Interests shall be deemed cancelled, terminated and of no further force or effect.

### 7.        Classification and Treatment of Claims and Interests of CRE

Class 1—CRE General Unsecured Claims

(a)        Classification:  Class 1 consists of all CRE General Unsecured Claims.

(b)        Impairment and Voting:  Class 1 is Impaired by the Plan.  Each Holder of a Claim that, if Allowed, would constitute a CRE General Unsecured Claim in Class 1 is entitled to vote to accept or reject the Plan.

(c)        Treatment:  In full satisfaction, settlement, release, and compromise of and in exchange for each CRE General Unsecured Claim, each Holder of an Allowed CRE General Unsecured Claim shall receive on the Initial Distribution Date and each Quarterly Distribution Date thereafter a Pro Rata Distribution of Residual Net Free Cash as such Residual Net Free Cash is available on such distribution date.

Class 2—CRE Stock Interests

(a)        Classification:  Class 2 consists of all CRE Stock Interests.

44

(b)        Impairment and Voting:  Class 2 is Impaired by the Plan.  BUFC, as sole Holder of the CRE Stock Interests in Class 2, is entitled to vote to accept or reject the Plan.

(c)        Treatment:  If, and only if, Residual Net Free Cash remains in CRE after satisfaction of all Allowed Claims against CRE, BUFC, as sole holder of the CRE Stock Interests, shall receive a Distribution of all remaining Residual Net Free Cash of CRE and any other assets comprising the CRE Estate.  If no Residual Net Free Cash remains in CRE after satisfaction of all Allowed Claims against CRE, then, on the earliest date following the Effective Date upon which a determination can be made that no Residual Net Free Cash remains in CRE, all CRE Stock Interests shall be deemed transferred to the Plan Administrator.  As set forth in the Plan, immediately after any and all Residual Net Free Cash of CRE is distributed, such CRE Stock Interests shall be deemed cancelled, terminated and of no further force or effect.

### C.      Means for Implementation of the Plan

#### 1.      Appointment of a Plan Administrator and a Plan Committee

The Plan provides that a Plan Administrator and Plan Committee shall be appointed on the Effective Date.  The Plan Administrator is _____.  The Plan Committee is _____.   The duties, powers, and obligations of the Plan Administrator and the Plan Committee shall be set forth in the Plan Administrator Agreement.  Among other things, the Plan Administrator, supervised by and consulting with the Plan Committee, shall be responsible for implementing the Plan, including monetizing or abandoning all of Liquidating BankUnited's assets, pursuing or abandoning all Causes of Action, resolving all Claims, and distributing Net Free Cash and Residual Net Free Cash pursuant to the Plan.  The Plan Administrator Agreement is included in the Plan Supplement.

### 2. Fees and Expenses of Liquidating BankUnited

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees or expenses of Liquidating BankUnited or the Plan Administrator, as applicable (including, without limitation, the reasonable fees and expenses of professionals retained by Liquidating BankUnited or the Plan Administrator), shall be paid in accordance with the Plan Administrator Agreement without further order of the Bankruptcy Court.  The reserve for costs of administering and implementing the Plan and ordinary business expenses of the Plan Administrator and the Wind Down shall in no event exceed $5 million for all Debtors.

### 3. Periodic Reports to Be Filed by Liquidating BankUnited

The Plan Administrator shall file periodic reports regarding the administration of Liquidating BankUnited's assets, the Distributions made by it and other matters required to be included in such report in accordance with the Plan Administrator Agreement.

### 4. Directors/Officers of the Debtors on the Effective Date

In accordance with the Plan, on the Effective Date, the persons then acting as directors and officers of each of the Debtors shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Debtors or the Chapter 11 Cases.  Nothing contained in the Plan shall release the Debtors' officers and directors from claims for actions taken before the Effective Date, including, but not limited to, any claims or actions set forth in the Proposed Complaint discussed earlier in this Disclosure Statement, other than as provided in Article IX of the Plan.

### 5. Plan Administrator

On the Effective Date, the Plan Administrator shall succeed to such powers as would have been applicable to the Debtors' officers, directors and shareholders (subject, at all times, to the oversight of the Plan Committee), and Liquidating BankUnited shall be authorized

to be (and, upon the conclusion of the Wind Down, shall be) dissolved by the Plan Administrator.  All property of the Debtors' Estates not Distributed to the Holders of Claims or Interests on the Effective Date shall be transferred to Liquidating BankUnited and managed and distributed by the Plan Administrator pursuant to the terms of the Plan Administrator Agreement and the Plan and shall be held in the name of Liquidating BankUnited free and clear of all Liens, Claims, charges or other encumbrances against any of the Debtors and the Interests in the Debtors, except for rights to such Distributions provided to Holders of Allowed Claims under the Plan.

As provided in the Plan Administrator Agreement, the Entity chosen to be the Plan Administrator shall have such qualifications and experience to enable it to perform its obligations under the Plan and under the Plan Administrator Agreement.  Following the Effective Date and in the event of the resignation or removal, liquidation, dissolution, death or incapacity of the Plan Administrator, the Plan Committee shall designate another Entity to become Plan Administrator and such Entity will become the successor Plan Administrator and, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of the predecessor Plan Administrator. The Plan Administrator's reasonable costs and expenses shall be compensated and reimbursed by Liquidating BankUnited as set forth in, and in accordance with, the Plan Administrator Agreement.

The Plan Administrator shall be deemed the representative of each of the Debtors' Estates in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Plan Administrator Agreement, including, without limitation (and except as otherwise provided in the Plan Administrator Agreement), the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004, including, without

US2008 2227176.11

limitation, the right to (a) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Plan Administrator Agreement, (b) prosecute, settle, abandon or compromise any Causes of Action, (c) make Distributions contemplated by the Plan, (d) establish and administer the Disputed Claims Reserve, (e) object to Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court objections to such claims, and (f) employ and compensate professionals and other agents, including one or more of the Professionals.

### 6.    Wind Down and Dissolution of the Debtors

The Plan provides that, after the Effective Date, Liquidating BankUnited shall remain in existence for the sole purpose of liquidation, distribution and dissolution.  On and after the Effective Date, the Plan Administrator shall make Distributions under the Plan and shall implement the dissolution of each of the entities comprising Liquidating BankUnited and monetization of any assets of Liquidating BankUnited pursuant to the Plan Administrator Agreement, any other provision of the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve each of the entities comprising Liquidating BankUnited.  As soon as practicable after the Effective Date, the Plan Administrator shall:  (a) take any action reasonably necessary to effectuate the Wind Down; (b) file for each of the entities comprising Liquidating BankUnited, a certificate of dissolution, together with all other necessary corporate and company documents, to effect the dissolution of Liquidating BankUnited under applicable non-bankruptcy law; (c) complete and file all final or otherwise required federal, state and local tax returns of the Debtors or Liquidating BankUnited, as applicable, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the entities comprising Liquidating BankUnited, the Debtors or their Estates for any tax incurred

US2008 2227176.11

during the administration of the Chapter 11 Cases, as determined under applicable tax laws; (d) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan; and (e) comply with any regulatory requirements imposed on Liquidating BankUnited under applicable law. The filing by the Plan Administrator of certificates of dissolution on behalf of each of the entities comprising Liquidating BankUnited shall be authorized and approved in all respects without further action under applicable law, regulation, order or rule, including, without limitation, any action by the stockholders or the board of directors of the Debtors or Liquidating BankUnited, as applicable.

   **7.  Cancellation of Existing Securities and Agreements; Claims of Subordination**

    On the Effective Date, except to the extent otherwise provided in the Plan, all notes, stock, instruments, certificates and other documents evidencing the Senior Notes Claims and the Subordinated Notes Claims, including the Senior Notes, the Trust Preferred Subordinated Debentures, the Trust Preferred Securities, and the Purchase Contract and Pledge Agreement, shall be deemed automatically canceled, shall be of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtors thereunder or in any way related thereto shall be discharged.

    On the Effective Date, except to the extent otherwise provided in the Plan, any indenture, guarantee or other agreement relating to any of the foregoing, including, without limitation, the Indentures, shall be deemed automatically canceled and terminated, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtors thereunder shall be discharged.

    As of the Effective Date, the transfer register or ledger maintained by the Indenture Trustees for the Senior Notes, the Trust Preferred Subordinated Debentures and the

US2008 2227176.11

Trust Preferred Securities shall be closed, and there shall be no further changes in the record Holders of any Senior Notes, Trust Preferred Subordinated Debentures or Trust Preferred Securities.

Notwithstanding Article IV.G.1 and Article IV.G.2 of the Plan, the Senior Notes, the Trust Preferred Subordinated Debentures, the Trust Preferred Securities and the Indentures shall continue in effect solely for purposes of (i) allowing the Indenture Trustees to receive Distributions under the Plan on behalf of the Holders of the Senior Notes and the Trust Preferred Subordinated Debentures, (ii) thereafter, allowing the Indenture Trustees to make Distributions to Holders of the Senior Notes and the Trust Preferred Subordinated Debentures, (iii) permitting the Indenture Trustees to maintain any rights and charging Liens they may have against Distributions or property held or collected by the Indenture Trustees for fees, costs and expenses pursuant to the Indentures, or for indemnification as provided for under the Indentures; (iv) permitting the Indenture Trustees to serve on the Plan Committee after the Effective Date; (v) permitting, but not requiring, the Indenture Trustees to exercise their rights  and obligations relating to the interest of their holders pursuant to the applicable Indentures; and (vi) permitting the Indenture Trustees to appear in these Chapter 11 Cases. The Senior Notes, the Trust Preferred Subordinated Debentures, the Trust Preferred Securities and the Indentures shall terminate completely upon completion of all Distributions by the Indenture Trustees to the Holders of the Senior Notes, the Trust Preferred Subordinated Debentures, and the Trust Preferred Securities.  The Plan provides that, after the performance by the Indenture Trustees or their respective Representatives of any duties that are required under the Plan, the Confirmation Order, and the Indentures, the Indenture Trustees and their respective Representatives shall be

relieved of and released from all obligations arising under the Indentures, and the Indenture Trustees and their respective Representatives shall be fully released and discharged.

The Plan provides that, as a precondition to payment of any Trustee Fees incurred prior to the Effective Date, each Indenture Trustee shall, at any time after the Effective Date and before the date that is thirty (30) days after the Effective Date, submit to Liquidating BankUnited or the Plan Administrator, as applicable, its invoices for payment of such Trustee Fees. Each Indenture Trustee shall also submit a statement reflecting the total amount sought pursuant to such invoice to each other Indenture Trustee. Liquidating BankUnited or the Plan Administrator, as applicable, shall, as soon as practicable thereafter, but in no event earlier than twenty (20) days after receipt thereof, and unless the Plan Administrator objects thereto or has received an objection thereto, reimburse the Indenture Trustee in Cash for such Trustee Fees; provided, however, that in exchange for such payment, the Indenture Trustee shall not assert a charging Lien for such payment on any Distribution made to and retained by the Indenture Trustee under the Plan on behalf of the Holders of the Senior Notes Claims and the Subordinated Notes Claims. In the event any such objection as to reasonableness of the Trustee Fees (which shall be the only basis for objection) is made or received by the Plan Administrator (which objection shall be made in writing and served on the Plan Administrator and the Indenture Trustee whose Trustee Fees are the subject of such objection within twenty (20) days of receipt of the applicable invoice or statement, but need not be filed with the Bankruptcy Court), Liquidating BankUnited or the Plan Administrator, as applicable, shall, as soon as practicable after such objection period has run, reimburse such Indenture Trustee in Cash only for the unobjected to portion of such Trustee Fees. In the event the parties are unable to resolve the objection, the applicable Indenture Trustee may file a motion or application with the Bankruptcy Court in accordance with Article

51

XI.A of the Plan seeking a determination concerning the reasonableness of such Trustee Fees or exercise their charging Lien under the applicable Indenture.  Subsequent submissions by an Indenture Trustee of Trustee Fees incurred after the Effective Date may be made from time to time, but no more frequently than monthly, in the same manner (and with the same objection and payment procedures) as set forth above.  Nothing in the Plan shall be construed as an agreement by an Indenture Trustee to a waiver of its charging Lien for any amounts not paid pursuant to Article IV.G.5 in the Plan, including, without limitation, any fees and expenses (including the fees and expenses of its professionals) accrued prior to or after the Petition Date.  The Plan further provides that in the event an Indenture Trustee chooses to exercise its charging Lien rather than seek payment through the provisions of Article IV.G.5 in the Plan, such Indenture Trustee may do so through a deduction in amounts received in any Distribution and no other filings or requests shall be necessary.

Notwithstanding Article IV.G.1 and Article IV.G.2 of the Plan, the Plan Administrator shall be deemed the holder of all equity interests in Liquidating BankUnited on and after the Effective Date solely to effectuate the terms of the Plan, provided, however, that, notwithstanding any provisions to the contrary contained in the Plan or Plan Administrator Agreement, the Plan Administrator shall not sell, convey or otherwise transfer any equity interest in Liquidating BankUnited absent: (a) the filing of a motion with the Bankruptcy Court; (b) notice to the Plan Committee; (c) entry of any order by the Bankruptcy Court authorizing any such sale, conveyance or other transfer in accordance with Article IV.E.1 of the Plan; (d) the filing of all appropriate forms by BankUnited, prior to any such sale, conveyance or transfer, terminating any continuing reporting obligations under the Securities and Exchange Act of 1934, and any regulations promulgated thereunder; and (e) confirmation that such sale, conveyance or

transfer would not result in Liquidating BankUnited becoming a public reporting company under the Securities and Exchange Act of 1934, and any regulations promulgated thereunder.

### 8.    Committee

As of the Effective Date, the Committee shall dissolve, and its members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Cases.  The retention and employment of the Professionals retained by the Committee shall terminate as of the Effective Date, provided, however, that the Committee shall exist, and its Professionals shall be retained, after such date solely with respect to applications Filed pursuant to sections 330 and 331 of the Bankruptcy Code.

### 9.    Vesting of Assets in Liquidating BankUnited

Except as otherwise provided in the Plan or in any agreement, instrument or other document relating thereto, on or after the Effective Date pursuant to section 1141 of the Bankruptcy Code, all property of the Debtors' Estates and any property acquired by the Debtors pursuant to the Plan shall vest in the appropriate entity comprising Liquidating BankUnited, free and clear of all Liens, Claims, charges or other encumbrances.  For the avoidance of doubt, all property of the Estate of Debtor BUFC shall vest in New BUFC, all property of the Estate of Debtor BUFS shall vest in New BUFS and all property of the Estate of Debtor CRE shall vest in New CRE, subject to the terms of the Plan.  Except as may be provided in the Plan, the Plan Administrator Agreement or the Confirmation Order, on and after the Effective Date, Liquidating BankUnited may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

US2008 2227176.11

10.     **Deregistration**

As soon after the Effective Date as is practicable, the Plan Administrator shall take such action as is reasonably necessary to relieve Liquidating BankUnited of the obligation to file periodic reports with the United States Securities and Exchange Commission or to otherwise comply with the statutory or regulatory requirements of a publicly traded company, including, but not limited to, seeking to deregister the BUFC Stock Interests.  To the extent relief or deregistration is not possible or feasible under applicable law, the Plan Administrator shall continue to comply with the reporting and other obligations of a public company under the Securities Act of 1933 and the Securities and Exchange Act of 1934, and any regulations promulgated thereunder.

11.     **Intercompany Claims and Interests**

In accordance with the Plan, Intercompany Claims shall be preserved, unless otherwise agreed or resolved between the parties to a given Intercompany Claim or otherwise released by operation of the Plan. Any such transaction may be effected without any further action by the stockholders of any of the Debtors.  Intercompany Interests shall be treated as set forth in Article III.C.3 and Article III.D.2  of the Plan.

12.     **Merger/Dissolution/Consolidation**

On or as of the Effective Date or as soon as practicable thereafter, and without the need for any consent or approval, the Plan Administrator may, in its sole and absolute discretion, (i) take appropriate corporate action in its capacity as the sole shareholder of each of the entities comprising Liquidating BankUnited to replace or appoint officers and directors and any other appropriate actions; (ii) cause any of the Liquidating BankUnited subsidiaries to be merged, dissolved, or otherwise consolidated with each other or with New BUFC, or (iii) engage in any other transaction with respect to the Liquidating BankUnited entities in furtherance of the Plan.

54

### D.      Provisions Governing Distribution

#### 1.      Initial Distribution Date

On the Initial Distribution Date or as soon thereafter as is reasonably practicable, Liquidating BankUnited or the Plan Administrator, as applicable, shall make the Distributions required to be made under the Plan.

#### 2.      Disputed Claims Reserve

##### i.      *Establishment of Disputed Claims Reserve*

On the Initial Distribution Date, and after making all Distributions required to be made on such date under the Plan, Liquidating BankUnited or the Plan Administrator, as applicable shall establish a separate Disputed Claims Reserve for Disputed Claims, which Disputed Claims Reserve shall be administered by the Plan Administrator.   Liquidating BankUnited or the Plan Administrator, as applicable, shall reserve in Cash the amount Holders of Disputed Claims would be entitled to receive under the Plan if all such Disputed Claims were to become Allowed Claims (or such lesser amount as may be estimated by the Bankruptcy Court in accordance with Article VI.D of the Plan).

##### ii.      *Maintenance of Disputed Claims Reserve*

To the extent that the property placed in the Disputed Claims Reserve consists of Cash, that Cash shall be deposited in an interest-bearing account.   Liquidating BankUnited or the Plan Administrator, as applicable, shall hold Cash in the Disputed Claims Reserve in trust for the benefit of the Holders of Claims ultimately determined to be Allowed.   The Plan Administrator shall, in its sole discretion, distribute such amounts (net of any expenses, including any taxes relating thereto), as provided in the Plan and in the Plan Administrator Agreement, as such Disputed Claims are resolved by a Final Order, and such amounts will be distributable in respect

US2008 2227176.11

of such Disputed Claims as such amounts would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date.

### 3. Quarterly Distributions

On each Quarterly Distribution Date or as soon thereafter as is reasonably practicable, Liquidating BankUnited or the Plan Administrator, as applicable, shall make the Distributions required to be made under the Plan on such date.  Any Distribution that is not made on the Initial Distribution Date or on any other date specified in the Plan because the Claim that would have been entitled to receive that Distribution is not an Allowed Claim on such date, shall be held by Liquidating BankUnited as applicable, in the Disputed Claims Reserve pursuant to Article V.B.2 of the Plan and Distributed on the first Quarterly Distribution Date after such Claim is Allowed. No interest shall accrue or be paid on the unpaid amount of any Distribution paid on a Quarterly Distribution Date in accordance with Article V.C of the Plan.

### 4. Record Date for Distributions

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date (which is two Business Days after the Confirmation Date) will be treated as the Holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Distribution Record Date.  Liquidating BankUnited shall have no obligation to recognize any transfer of any Claim occurring after the Distribution Record Date.  In making any Distribution with respect to any Claim, Liquidating BankUnited as applicable, shall be entitled instead to recognize and deal with, for all purposes under the Plan, only the Entity that is listed on the Proof of Claim Filed with respect thereto or on the Schedules as the Holder thereof as of the close of business on the

US2008 2227176.11

Distribution Record Date and upon such other evidence or record of transfer or assignment that is known to Liquidating BankUnited as applicable, as of the Distribution Record Date.

     **5.**       **Delivery of Distributions**

         *i.*      *General Provisions; Undeliverable Distributions*

Subject to Bankruptcy Rule 9010 and except as otherwise provided in the Plan, Distributions to the Holders of Allowed Claims shall be made by Liquidating BankUnited or the Plan Administrator, as applicable, at (i) the address of each Holder as set forth in the Schedules, unless superseded by the address set forth on Proofs of Claim Filed by such Holder or (ii) the last known address of such Holder if no Proof of Claim is Filed or if the Debtor, Liquidating BankUnited or the Plan Administrator, as applicable, has been notified in writing of a change of address; provided, however, that Distributions paid by Liquidating BankUnited or the Plan Administrator, as applicable, for the benefit of holders of Senior Notes Claims or Subordinated Notes Claims shall be made to the appropriate Indenture Trustee under the respective Indenture documents for such obligations.  Each such Indenture Trustee shall, in turn, establish a record date for Distributions and administer the Distributions to the respective holders of Allowed Claims in accordance with the Plan and the applicable Indentures.  The Indenture Trustees shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court.  The Indenture Trustees shall only be required to make Distributions in accordance with the terms of the Plan and the respective Indenture and shall have no liability for actions taken in accordance with the Plan or in reliance upon information provided to the Indenture Trustees in accordance with the Plan, except for liabilities resulting from their own gross negligence or willful misconduct.

If any Distribution is returned as undeliverable, Liquidating BankUnited or the Plan Administrator, as applicable, may, in its discretion, make such efforts to determine the

US2008 2227176.11

current address of the Holder of the Claim with respect to which the Distribution was made as Liquidating BankUnited or the Plan Administrator, as applicable, deems appropriate, but no Distribution to any Holder shall be made unless and until Liquidating BankUnited or the Plan Administrator, as applicable, has determined the then-current address of the Holder, at which time the Distribution to such Holder shall be made to the Holder without interest.  Amounts in respect of any undeliverable Distributions made by Liquidating BankUnited or the Plan Administrator, as applicable, shall be returned to, and held in trust by, Liquidating BankUnited or the Plan Administrator, as applicable, until the Distributions are claimed or are deemed to be unclaimed property under section 347(b) of the Bankruptcy Code as set forth in the Plan. Liquidating BankUnited or the Plan Administrator, as applicable, shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible; provided, however, that its discretion may not be exercised in a manner inconsistent with any express requirements of the Plan or the Plan Administrator Agreement.

The Indenture Trustees shall only be required to act and make Distributions in accordance with the terms of the Plan and applicable Indenture documents and shall have no (i) liability for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (ii) obligation or liability for Distributions under the Plan to any party who does not hold a Claim as of the Distribution Record Date or who does not otherwise comply with the Plan.

*ii.    Unclaimed Property*

Except with respect to property not Distributed because it is being held in the Disputed Claims Reserve, Distributions that are not claimed by the expiration of one year from the Initial Distribution Date or Quarterly Distribution Date applicable to such Distribution, shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and shall vest

58

or revest in Liquidating BankUnited, and the Claims with respect to which those Distributions are made shall be automatically canceled. After the expiration of such one-year period, the Claim of any Entity to those Distributions shall be discharged and forever barred.  Nothing contained in the Plan shall require Liquidating BankUnited to attempt to locate any Holder of an Allowed Claim.  Except as otherwise provided in the Plan, all funds or other property that vests or revests in Liquidating BankUnited pursuant to the Plan shall be distributed by the Plan Administrator in accordance with the provisions of the Plan or the Plan Administrator Agreement.

### 6.    Surrender of Canceled Instruments and Securities

#### i.    *Generally*

Except to the extent evidenced by electronic entry, as a condition of receiving any Distribution under the Plan, each holder of a certificated instrument or note must surrender such instrument or note to the appropriate Indenture Trustee or the Plan Administrator or its designee. Any holder of such instrument or note that fails to (i) surrender such instrument or note or (ii) execute and deliver to the appropriate Indenture Trustee or the Plan Administrator to such party an affidavit of loss and/or indemnity reasonably satisfactory before the first anniversary of the Effective Date shall be deemed to have forfeited all rights and Claims and may not participate in any Distribution under the Plan.  Any Distribution so forfeited shall become the property of the Plan Administrator for Distribution to Holders of Allowed Claims in accordance with the terms and provisions of the Plan.

#### ii.    *Failure to Surrender Canceled Instruments*

If any Holder of an Allowed Claim evidenced by instruments, securities or other documentation canceled pursuant to the Plan, fails to surrender such instrument, security or other documentation or comply with the provisions of the Plan within one year after the Effective Date, its Claim for a Distribution under the Plan on account of such instrument, security, or other

US2008 2227176.11

documentation shall be discharged, and such Holder shall be forever barred from asserting such Claim against Liquidating BankUnited or its property. In such case, any property held on account of such Claim shall be disposed of pursuant to the provisions set forth in the Plan.

7.      **Manner of Cash Payments Under the Plan or the Plan Administrator Agreement**

Cash payments made pursuant to the Plan or the Plan Administrator Agreement shall be in United States dollars by checks drawn on a domestic bank selected by the Plan Administrator or by wire transfer from a domestic bank, at the option of the Plan Administrator.

8.      **Time Bar to Cash Payments by Check**

Checks issued by Liquidating BankUnited on account of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for the reissuance of any check that becomes null and void pursuant to the Plan shall be made directly to the Plan Administrator by the Holder of the Allowed Claim to whom the check was originally issued.  Any claim in respect of such voided check shall be made in writing on or before the later of the first anniversary of the Initial Distribution Date or Quarterly Distribution Date on which such check was issued.  After that date, all Claims in respect of void checks shall be discharged and forever barred and the proceeds of those checks shall revest in and become the property of Liquidating BankUnited as unclaimed property in accordance with section 347(b) of the Bankruptcy Code and be distributed as provided in the Plan.

9.      **Compliance with Tax Requirements**

In connection with making Distributions under the Plan, to the extent applicable, the Plan Administrator shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  The Plan Administrator may withhold

US2008 2227176.11

the entire Distribution due to any Holder of an Allowed Claim until such time as such Holder provides the necessary information to comply with any withholding requirements of any governmental unit.  Any property so withheld will then be paid by the Plan Administrator to the appropriate authority.  If the Holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any governmental unit within six (6) months from the date of first notification to the Holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then such Holder's Distribution shall be treated as an undeliverable Distribution in accordance with the Plan.

### 10.      No Payments of Fractional Dollars

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

### 11.      Interest on Claims

Except as specifically provided for in the Plan or the Confirmation Order, interest shall not accrue on Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if the Disputed Claim becomes an Allowed Claim. Except as expressly provided in the Plan or in a Final Order of the Bankruptcy Court, no prepetition Claim shall be Allowed to the extent that it is for postpetition interest or other similar charges.

US2008 2227176.11

12.     **No Distribution in Excess of Allowed Amount of Claim**

Notwithstanding anything to the contrary contained in the Plan, no Holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of that Claim.

13.     **Setoff and Recoupment**

Liquidating BankUnited or the Plan Administrator, as applicable, may, but shall not be required to, set off against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims or defenses of any nature whatsoever that the Debtor, the Estate or Liquidating BankUnited may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor, the Estate, or Liquidating BankUnited of any right of setoff or recoupment that any of them may have against the Holder of any Claim.

14.     **Contractual Subordination Rights**

Notwithstanding anything in the Plan or any annex, attachment, schedule or exhibit to the Plan, the subordination rights in respect of the Senior Notes, the Trust Preferred Subordinated Debentures, and the HiMEDS Contract Adjustment Payments shall be controlled and governed by the Indentures providing for and relating to such subordination rights and nothing in the Plan or any annex, attachment, schedule or exhibit to the Plan, shall amend, modify or impair such rights (or any remedies in respect thereof) in any manner or fashion.

E.     **Disputed Claims**

1.     **No Distribution Pending Allowance**

Notwithstanding any other provision of the Plan, the Plan Administrator shall not distribute any Cash or other property on account of any Disputed Claim unless and until such Claim becomes Allowed.

62

### 2.        Resolution of Disputed Claims

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Plan Administrator shall have the right to the exclusion of all others (except as to the Professionals' applications for allowances of compensation and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code) to make, File, prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court, objections to Claims.   The costs of pursuing the objections to Claims shall be borne by Liquidating BankUnited.

### 3.        Objection Deadline

All objections to Disputed Claims shall be Filed and served upon the Holders of each such Claim on or before the Claims Objection Bar Date (which is six months after the Effective Date of the Plan), unless otherwise ordered by the Bankruptcy Court after notice and a hearing.

### 4.        Estimation of Claims

At any time, subsequent to the Effective Date, Liquidating BankUnited or the Plan Administrator, as applicable, may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether the Debtor, Liquidating BankUnited or the Plan Administrator has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.

US2008 2227176.11

### 5. Disallowance of Claims

Except as otherwise agreed, any and all Proofs of Claim Filed after the Uniform Bar Date (which was November 17, 2009) shall be deemed disallowed and expunged as of the Effective Date without any further notice or action, order or approval of the Bankruptcy Court, and Holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Confirmation Date the Bankruptcy Court has entered an order deeming such Claim to be timely filed.

### F. Treatment of Executory Contracts and Unexpired Leases

### 1. Assumption and Rejection of Executory Contracts and Unexpired Leases

Any executory contracts and unexpired leases that are listed in the Plan Supplement as executory contracts or unexpired leases to be assumed, or that are to be assumed pursuant to the terms of the Plan, shall be deemed assumed by the Debtors as of immediately prior to the Effective Date, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

The Plan shall constitute a motion to reject all executory contracts and unexpired leases not listed as assumed executory contracts or unexpired leases in the Plan Supplement, and the Debtors or Liquidating BankUnited, as applicable, shall have no further liability thereunder except with respect to Claims created by the rejection as set forth in Article VII of the Plan. The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination that the rejection thereof is in the best interests of the Debtors, their Estates and all parties in interest in the Chapter 11 Cases.

US2008 2227176.11

### 2. Claims Based on Rejection of Executory Contracts or Unexpired Leases

Claims created by the rejection of executory contracts and unexpired leases pursuant to Article VII.A of the Plan, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be filed against the applicable Debtor or Debtors with the Bankruptcy Court and served on Liquidating BankUnited no later than thirty (30) days after the Effective Date.  Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Article VII.A of the Plan for which Proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtors, Liquidating BankUnited, the Debtors' Estates, their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction provided for in Article IX.D of the Plan.  Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided in the Plan shall be treated under the Plan as General Unsecured Claims against the applicable Debtor or Debtors against whom the Claim is filed and shall be subject to the provisions of Article III of the Plan.

### G. Conditions Precedent to Confirmation and the Effective Date

### 1. Conditions to Confirmation

The following are conditions precedent to entry of the Confirmation Order that must be satisfied or waived in accordance with Article VIII.C of the Plan:

(a)     The Bankruptcy Court shall have approved the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

US2008 2227176.11

(b)        All objections to confirmation of the Plan are either withdrawn, resolved or overruled.

(c)        The most current version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed.

### 2.        Conditions Precedent to the Effective Date

The following are conditions precedent to the Effective Date that must be satisfied or waived in accordance with Article VIII.C of the Plan:

(a)        The Confirmation Order shall not be stayed and shall be in full force and effect.

(b)        The Benefit Plans shall have been terminated in accordance with applicable law.

(c)        The Plan Committee and the Plan Administrator shall have been appointed in accordance with the terms of the Plan and the Plan Administrator Agreement.

### 3.        Waiver of Conditions Precedent

The Committee may waive the occurrence of or modify any condition precedent in the Plan.  Any such written waiver of a condition precedent may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.  The failure of the Committee to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

US2008 2227176.11

H.    **Release, Injunction, and Related Provisions**

1.    **Compromise and Settlement**

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided by the Plan, the Plan shall constitute a good faith compromise of all Claims and Interests.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and the holders of Claims and Interests.

2.    **Exculpation**

**Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall neither have nor incur any liability to any Entity for any and all claims and Causes of Action arising on or after the Petition Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other act taken after the Petition Date or omitted to be taken in connection with or in contemplation of the transactions occurring in the Chapter 11 Cases; provided, however, that the foregoing provisions shall (a) have no effect on the liability of any Exculpated Party that results from any act or omission that is determined in a Final Order to be solely due to such Exculpated Party's own gross negligence or willful misconduct; and (b) not preclude any Entity from objecting to Accrued Professional Compensation or fees and**

US2008 2227176.11

expenses previously awarded that if unpaid would constitute Accrued Professional Compensation or Trustee Fees.

Exculpated Parties is defined in the Plan as meaning, collectively, the Debtors, the boards of directors and individual directors and board committees of the Debtors during the Chapter 11 Cases, any officer of employee of the Debtors during the Chapter 11 Cases, the Committee and the individual members thereof, the Indenture Trustees (i.e., the Senior Indenture Trustees and the Subordinated Indenture Trustees), and each of their respective Representatives. "Representatives" is defined in the Plan to include, with regard to an Entity or the Committee, officers, directors, members, employees, advisors, attorneys, accountants and agents, and their respective professional firms.

3.    No Release of Co-Obligor or Joint Tortfeasor

No provision of the Plan, including, without limitation, any release or exculpation provision, shall modify, release, or otherwise limit the liability of any Entity other than the Exculpated Parties, including, without limitation, any Entity that is a co-obligor, guarantor or joint tortfeasor of an Exculpated Party or that otherwise is liable under theories of vicarious or other derivative liability.

4.    Preservation of Rights of Action

i.    Vesting of Causes of Action

Except as otherwise provided in the Plan or Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtors may hold against any Entity shall vest upon the Effective Date in Liquidating BankUnited.

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Plan Administrator shall have the exclusive right to institute, prosecute,

US2008 2227176.11

abandon, settle or compromise any Causes of Action, in accordance with the terms of the Plan Administrator Agreement and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in any of the Chapter 11 Cases. Without limiting the generality of the foregoing, upon the Effective Date, the Plan Administrator, or Liquidating BankUnited, as applicable, shall be deemed substituted for the relevant Debtor in any pending adversary proceedings to which one or more of the Debtors were a party, including without limitation Adversary Proceeding Numbers 10-03075-LMI and 10-02872-LMI, commenced in the Chapter 11 Cases, and any appeals arising out of such adversary proceedings.

Causes of Action and any recoveries therefrom shall remain the sole property of Liquidating BankUnited (for the sole benefit of Entities entitled to Distributions under the Plan), as the case may be, and Holders of Claims shall have no right to any such recovery.

ii. *Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order), Liquidating BankUnited and the Plan Administrator expressly reserve such Cause of Action for later adjudication by Liquidating BankUnited or the Plan Administrator (including, without limitation, Causes of Action not specifically identified or described in the Plan Supplement or elsewhere or of which the Debtors, Liquidating BankUnited or the Plan Administrator may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors, Liquidating BankUnited or the Plan Administrator at this time or facts or circumstances which may change or be different from those the Debtors, Liquidating BankUnited or the Plan Administrator now believe to exist) and,

therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or occurrence of the Effective Date based on the Disclosure Statement, Plan or Confirmation Order, except where such Causes of Action have been released in the Plan or any other Final Order (including the Confirmation Order).  In addition, the Debtors, Liquidating BankUnited and the Plan Administrator expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which one or more of the Debtors are a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Subject to the immediately preceding paragraph, any Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors, should assume that any such obligation, transfer, or transaction may be reviewed by the Plan Administrator subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether: (i) such Entity has filed a Proof of Claim against the Debtors in their Chapter 11 Cases; (ii) the Debtors, Liquidating BankUnited or the Plan Administrator have objected to any such Entity's Proof of Claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtors, Liquidating BankUnited or the Plan Administrator have objected to any such Entity's scheduled Claim; or (v) any such Entity's scheduled Claim has been identified by the Debtors, Liquidating BankUnited or the Plan Administrator as disputed, contingent or unliquidated.

70

5.      **Release and Injunction**

**In accordance with the Plan, from and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtors, Liquidating BankUnited, their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order.**

**Until all property of each of the Debtors' Estates has been liquidated, collected and/or distributed, or abandoned as provided in the Plan, and Liquidating BankUnited has made all Distributions contemplated by the Plan and except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtors, Liquidating BankUnited, or their successors and assigns and their assets and properties, any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.**

**The rights afforded in the Plan and the treatment of all Claims and Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtors or Liquidating BankUnited or any of their assets or properties.  On the Effective Date, all such Claims against, and Interests in, the Debtors shall be satisfied and released in full.**

**Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all parties and Entities are permanently enjoined, on and after**

71

the Effective Date, on account of any Claim against or Interest in the Debtors that is satisfied and released hereby, from:

(a)        commencing or continuing in any manner any action or other proceeding of any kind against the Debtors, Liquidating BankUnited, their successors and assigns and their assets and properties;

(b)        enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtors, Liquidating BankUnited, their successors and assigns and their assets and properties;

(c)        creating, perfecting or enforcing any encumbrance of any kind against the Debtors, Liquidating BankUnited or the property or Estates of the Debtors or Liquidating BankUnited;

(d)        asserting any right of setoff or subrogation of any kind against any obligation due from the Debtors or against the property or Estates of the Debtors or Liquidating BankUnited, except to the extent a right to setoff or subrogation is asserted with respect to a timely filed Proof of Claim; or

(e)        commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim against or Interest in the Debtors or Cause of Action that is released or settled under the Plan.

6.        Releases of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of the Estate shall be fully released and discharged (except for the charging Liens of the Indenture Trustees to the extent the Trustee Fees or any other fees owed to the Indenture Trustees under the Indentures are

72

not paid pursuant to the Plan) and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interest shall revert to Liquidating BankUnited and the Plan Administrator.

**I.      Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors, Liquidating BankUnited, the Plan Administrator and the Plan as is legally permissible, including, without limitation, jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Interests;

2.      grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3.      resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired lease to which the Debtors or Liquidating BankUnited, as applicable, is a party or with respect to which the Debtors or Liquidating BankUnited, as applicable, may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including those matters related to any amendment to the Plan after the Effective Date pursuant to Article XI.C of the Plan adding executory contracts or unexpired leases to the list of executory contracts and unexpired leases to be assumed;

US2008 2227176.11

4.        ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.        decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by Liquidating BankUnited or the Plan Administrator after the Effective Date, provided, however, that Liquidating BankUnited and the Plan Administrator shall reserve the right to commence actions in all appropriate jurisdictions;

6.        enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, Plan Supplement or the Disclosure Statement;

7.        resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

8.        issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

9.        enforce Article IX.A and Article IX.C of the Plan;

10.        enforce the injunction set forth in Article IX.D of the Plan;

11.        resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article IX of the Plan, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

US2008 2227176.11

12.      enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

13.      resolve any other matters that may arise in connection with or relate to the Plan Administrator Agreement, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

14.      enter an order and/or the decree contemplated in section 350 of the Bankruptcy Code and Bankruptcy Rule 3022 concluding the Chapter 11 Cases.

### J.    Miscellaneous Provisions

#### 1.    Final Fee Applications and Initial Trustee Fees

In accordance with the Plan, the deadline for submission by Professionals of applications for Bankruptcy Court approval of Accrued Professional Compensation, and by each Indenture Trustee for payment of any disputed Trustee Fees incurred on or before the Effective Date, is 30 days after the Effective Date.

#### 2.    Payment of Statutory Fees

Notwithstanding any other provision of the Plan, the Debtors shall pay within ten days after the Effective Date all fees incurred under 28 U.S.C. § 1930(a)(6) attributable to the Debtors for the period ending on the Effective Date.  For the period commencing on the Effective Date through the earlier of (a) the closing of the Bankruptcy Cases by the issuance of a final decree by the Bankruptcy Court and (b) entry of an order dismissing or converting the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, the Plan Administrator shall (x) file with the Bankruptcy Court the quarterly operating reports regarding Liquidating BankUnited for the post-confirmation period and (y) pay all fees incurred under 28 U.S.C. § 1930(a)(6) based on the disbursements made pursuant to the Plan.

### 3.        Modification of Plan

Subject to the limitations contained in the Plan: (1) the Committee reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Committee, Liquidating BankUnited or the Plan Administrator, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

### 4.        Revocation of Plan

The Committee reserves the right to withdraw the Plan prior to the entry of the Confirmation Order, and to file subsequent chapter 11 plans.  If the Committee withdraws the Plan, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any claims by or against, or any Interests in, the Debtors or any other Entity; (b) prejudice in any manner the rights of the Committee, the Debtors or any other Entity; or (c) constitute an admission of any sort by the Committee, the Debtors or any other Entity.

### 5.        Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### 6.        Governing Law

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida, without giving effect to the principles of conflict of laws thereof.

### 7.        Reservation of Rights

The Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs.  Neither the filing of the Plan, any statement or provision contained therein, nor the taking of any action by the Committee, any of the Debtors or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (i) the Committee; (ii) the Debtors with respect to the Holders of Claims or Interests or other parties-in-interest; or (iii) any Holder of a Claim or other party-in-interest prior to the Effective Date.

### 8.        Section 1146 Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

US2008 2227176.11

### 9. Section 1125(e) Good Faith Compliance

The Debtors, the Committee and its individual members, and each of their respective Representatives, shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

### 10. Further Assurances

The Committee, the Debtors, Liquidating BankUnited, the Plan Administrator, all Holders of Claims receiving Distributions under the Plan, and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

### 11. Service of Documents

Any pleading, notice or other document required by the Plan to be served on or delivered to the Committee or the Debtors shall be sent by first class U.S. mail, postage prepaid as follows:

To the Committee:

> Kilpatrick Townsend & Stockton LLP
> 1100 Peachtree Street, Suite 2800
> Atlanta, Georgia  30309
> Attn:  Todd C. Meyers
> Attn:  Robbin S. Rahman
> Telephone:  (404) 815-6500
> Fax:  (404) 815-6555
> Email:  tmeyers@kilpatricktownsend.com

To the Debtors:

> BankUnited Financial Corporation
> c/o Development Specialists, Inc.
> 200 South Biscayne Boulevard, Suite 1818
> Miami, Florida  33131
> Attention:  Joseph J. Luzinski, Chief Restructuring Officer
> Telephone:  (305) 374-2717

Fax:  (305) 374-2718
Email:  jluzinski@dsi.biz

*with a copy to:*

Mark D. Bloom, Esq.
GREENBERG TRAURIG, P.A.
333 Avenue of the Americas (333 S.E. 2d Avenue)
Miami, Florida  33131
Telephone:  (305) 579-0500
Fax:  (305) 579-0717
Email:  bloomm@gtlaw.com

-and-

US2008 2227176.11

Scott M. Grossman, Esq.
GREENBERG TRAURIG, P.A.
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, Florida 33301
Telephone: (954) 765-0500
Fax: (954) 765-1477
Email: grossmansm@gtlaw.com

To the Plan Administrator:

**[INSERT]**

### 12.    Filing of Additional Documents

On or before the Effective Date, the Committee, the Debtors or Liquidating BankUnited, as applicable, may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 13.    Aid and Recognition

The Committee, the Debtors, Liquidating BankUnited or the Plan Administrator, as the case may be, shall, as needed to effect the terms of the Plan, request the aid and recognition of any court or judicial, regulatory or administrative body in any nation, province or state.

### 14.    Document Retention

From and after the Effective Date, the Debtors, Liquidating BankUnited, the Plan Administrator, and any transferee of the Debtors' documents, as the case may be, shall preserve and maintain all of the documents, whether retained by the Debtors or any successor to the Debtors, or transferred to Liquidating BankUnited, the Plan Administrator pursuant to the Plan Administrator Agreement, or such other transferee pursuant to the Plan; and any successors to the Debtors, Liquidating BankUnited, the Plan Administrator and/or such other transferee shall

not destroy or otherwise abandon any such documents absent further order of this Court or a court of competent jurisdiction after a hearing upon notice to parties in interest with an opportunity to be heard.

## V.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a summary of the confirmation process for a Chapter 11 plan.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors.

### A.    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a hearing to consider confirmation of a plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation.

### B.    Confirmation Standards

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Committee believes that: (1) the Plan satisfies or will satisfy all of the statutory requirements of Chapter 11 of the Bankruptcy Code; (2) it has complied or will have complied with all of the requirements of Chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith. Specifically, the Committee believes that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

1.    The Plan complies with all applicable provisions of the Bankruptcy Code.

2.    The Committee, as the Plan proponent, will have complied with the applicable provisions of the Bankruptcy Code.

3.    The Plan has been proposed in good faith and not by any means forbidden by law.

81

4.      Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be disclosed to the Bankruptcy Court, and any such payment:  (a) made before the confirmation of the Plan will be reasonable; or (b) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after confirmation of the Plan.

5.      Each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.  Each Holder of an Impaired Interest has accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

6.      Each Class of Claims or Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims or Interests pursuant to section 1129(b) of the Bankruptcy Code.

7.      Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that:  (a) Holders of Administrative Claims will receive, on account of such Claims, Cash equal to the Allowed amount of such Claim on the Effective Date of the Plan, or as soon thereafter as is reasonably practicable; (b) Holders of Claims specified in section 507(a)(4), 507(a)(5), or 507(a)(7) of the Bankruptcy Code will receive Cash on the Effective Date equal to the Allowed amount of such Claim; and (c) Holders of Claims specified in section 507(a)(8) of the Bankruptcy Code will receive on account of such Claim regular installment payments of Cash of a total value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim over a period ending not later than five years after the Petition Date.  Holders of Allowed FDIC Priority Claims shall receive periodic payments of Net Free Cash until such Allowed Claim is paid in full.

8.      At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any Insider holding a Claim in that Class.

9.      Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization (which it does in this instance).

10.     The Debtors have paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

US2008 2227176.11

11.     In addition to the filing fees paid to the clerk of the Bankruptcy Court, quarterly fees will be paid no later than the last day of the calendar month following the calendar quarter for which the fee is owed in the Debtors' Chapter 11 Cases for each quarter to the U.S. Trustee, until the Chapter 11 Cases are closed, converted, or dismissed, whichever occurs first.

## C.     Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to confirmation, that confirmation is not likely to be followed by the liquidation of the Debtors, unless such liquidation is proposed in the Plan.  The Plan contemplates that all assets of the Debtors ultimately will be disposed of and all proceeds of the assets will be distributed to the Holders of Allowed Claims pursuant to the terms of the Plan.  Since no further reorganization of the Debtors will be possible, the Committee believes that the Plan meets the feasibility requirement.  In addition, based upon the proceeds resulting from the liquidation, the Committee believes that sufficient funds will exist at confirmation to make the payments required by the Plan.

## D.     Best Interest of Creditors Test

Under the Bankruptcy Code, confirmation of a plan also requires a finding that the plan is in the "best interests" of creditors.  Under the "best interests" test, the Bankruptcy Court must find (subject to certain exceptions) that the Plan provides, with respect to each Impaired Class, that each Holder of an Allowed Claim or Interest in such Impaired Class has accepted the Plan, or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The analysis under the "best interests" test requires that the Bankruptcy Court determine what Holders of Allowed Claims and Interests in each Impaired Class would receive if the Debtor's Chapter 11 Cases were converted to liquidation cases under chapter 7 of the

US2008 2227176.11

Bankruptcy Code, and the Bankruptcy Court appointed a chapter 7 trustee to liquidate all of the Debtors' assets into Cash.  The Debtors' "liquidation value" would consist primarily of the following: (i) unencumbered and unrestricted Cash held by the Debtors at the time of the conversion to chapter 7 cases; (ii) the proceeds resulting from the chapter 7 trustee's sale of the Debtors' remaining unencumbered assets; (iii) the value associated with the Debtors' litigation with the FDIC regarding the Debtors' ownership of certain Tax Refunds and the Debtors' proof of claim filed in the Bank's receivership action as described above in Article III; and (iv) the value associated with claims against former officers and directors of the Debtors for breaches of fiduciary duties as described above in Article III of this Disclosure Statement.  The gross Cash available for distribution would be reduced by the costs and expenses incurred in effectuating the chapter 7 liquidation and any additional Administrative Claims incurred during the chapter 7 cases.

The Bankruptcy Court then must compare the value of the distributions from the proceeds of the hypothetical chapter 7 liquidation of the Debtors (after subtracting the chapter 7-specific claims and administrative costs) with the value to be distributed to the Holders of Allowed Claims under the Plan.  It is possible that in a chapter 7 liquidation, Claims and Interests may not be classified in the same manner as set forth in the Plan.  In a hypothetical chapter 7 liquidation of the Debtors' assets, the rule of absolute priority of distribution would apply, i.e., no junior creditor would receive any distribution until payment in full of all senior creditors, and no Holder of an Interest would receive any distribution until all creditors have been paid in full.

Of the foregoing groups of Claims, Classes 1 and 2 for BUFC and Class 1 for BUFS are "Unimpaired" under the Plan, meaning that the Plan generally leaves their legal, equitable, and

contractual rights unaltered. As a result, Holders of such Claims are conclusively presumed to accept the Plan. The remainder of the Classes of Claims and Interests are "Impaired" under the Plan and are either entitled to vote on, or conclusively presumed to reject, the Plan. Because the Bankruptcy Code requires that Holders of Claims in voting Classes either accept the Plan or receive at least as much under the Plan as they would in a hypothetical chapter 7 liquidation, the operative "best interests" inquiry in the context of the Plan is whether in a chapter 7 liquidation, the Holders of Impaired Claims and Interests will receive more or less than under the Plan. If the probable distribution to Holders of Impaired Claims and Interests under a hypothetical chapter 7 liquidation is greater than the distributions to be received by such Holders under the Plan, then the Plan is not in the best interests of Holders of Impaired Claims and Interests.

Based upon the conclusions set forth in the Liquidation Analysis, attached to this Disclosure Statement as Exhibit B, the Committee believes that the value of distributions, if any, in a hypothetical chapter 7 liquidation to Holders of Allowed General Unsecured Claims and Interests would be less than or equal to the value of distributions to such Holders under the Plan. The Committee believes that the Plan satisfies the "best interests" test of section 1129(a)(7) of the Bankruptcy Code.

### E.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is conclusively presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (ii) cures any default and reinstates the original terms of such obligation; or (iii)

US2008 2227176.11

provides that, on the Effective Date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

The Claims in Classes 1 and 2 for BUFC and Class 1 for BUFS are not Impaired under the Plan, and, as a result, the Holders of such Claims are conclusively presumed to have accepted the Plan.

The voting Classes are Impaired under the Plan, and the Holders of Claims in such Classes are entitled to vote on the Plan.  Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described herein.

### F.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a Plan even if all other impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or conclusively presumed

86

rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

### 1.    No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.    Fair and Equitable Test

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the non-accepting class, the test sets different standards depending on the type of claims or equity interests in such class.

Secured Claims:  The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (b) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the

US2008 2227176.11

plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

Unsecured Claims:  The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

Equity Interests:  The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:  (a) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (i) the allowed amount of any fixed liquidation preference to which such holder is entitled; (ii) any fixed redemption price to which such holder is entitled; or (iii) the value of such interest; or (b) if the class does not receive the amount as required under (a), no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

The Committee will seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code in view of the conclusively presumed rejection by Classes 7 and 8 for BUFC. To the extent that any of the voting Classes vote to reject the Plan, the Committee further reserves the right to (a) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XI of the Plan.

US2008 2227176.11

The votes of Holders of Interests in Classes 7 and 8 for BUFC are not being solicited because, as set forth in Article III of the Plan, there will be no distribution to either of these Classes and these Interests will be cancelled.

Notwithstanding the conclusively presumed rejection by Classes 7 and 8 for BUFC or any Class that votes to reject the Plan, the Committee does not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Interests.  The Committee believes that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

## VI.    CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

### A.    Certain Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect Distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

#### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Committee believes that the classification of Claims and Interests under its Plan complies with the requirements set forth in the Bankruptcy Code because the Committee created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each

such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.      Failure to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Committee intends to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Committee may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### 3.      The Committee May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial restructuring unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if

US2008 2227176.11

the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

Confirmation of the Plan is also subject to certain conditions precedent as described in Article VIII of the Plan.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive with respect to their Allowed Claims.

The Committee, subject to the terms and conditions of the Plan, reserves the right to modify the terms and conditions of the Plan as necessary for confirmation.  Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan, or no distribution of property whatsoever under the Plan.

### 4.    Nonconsensual Confirmation

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Committee believes that its Plan satisfies these requirements and the Committee may request

such nonconsensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual confirmation of the Plan may result in, among other things, increased expenses relating to Professional Claims.

### 5.    The Committee May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Committee reserves the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection may not receive its expected share of the estimated Distributions described in this Disclosure Statement and may not be entitled to vote on the Plan.

### 6.    The FDIC Has Asserted a Claim under section 365(o) of the Bankruptcy Code

The FDIC has asserted a claim against BUFC under section 365(o) of the Bankruptcy Code in an undetermined amount, but purportedly in excess of $1 billion (which BUFC vigorously disputes), contending that BUFC's alleged failure to maintain adequate capitalization of the Bank and cure the deficit as required by section 365(o) gives rise to liability to the FDIC.  The FDIC also contends that the amounts it asserts under section 365(o) are entitled to priority status pursuant to section 507(a)(9) of the Bankruptcy Code.  If the FDIC's section 365(o) claim is allowed, recoveries to the Holders of General Unsecured Claims against BUFC may be materially reduced (with possibly no recovery) or the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code.

US2008 2227176.11

7.      **Risk of Non-Occurrence of the Effective Date**

Although the Committee believes that the Effective Date may occur promptly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

8.      **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The Distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims and the outcome of litigation with the FDIC and former officers and directors of the Debtors.  The occurrence of any and all such contingencies, which could affect Distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

B.      **Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims**

**HOLDERS OF CLAIMS AND INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND RELATED DOCUMENTS, REFERRED TO OR INCORPORATED BY REFERENCE IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THIS ARTICLE PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

1.      **The Committee Cannot State with any Degree of Certainty What Recovery Will Be Available to Holders of Allowed Claims in Voting Classes**

No less than three unknown factors make certainty of creditor recoveries under the Plan impossible.  First, the Committee cannot know with any certainty, at this time, how

US2008 2227176.11

much money will be available for distribution to Holders of Allowed Claims after monetization of the Debtors' assets.  Second, the Committee cannot know with any certainty, at this time, the number or amount of Claims that will ultimately be Allowed.  Third, the Committee cannot know with any certainty, at this time, the number or size of Claims senior to the voting Classes or unclassified Claims that will ultimately be Allowed.

> **2.      The Debtors Are Involved in Litigation Which, if Adversely Determined, Could Result in Substantially Less Funds Being Available for Distribution**

The Debtors are involved in litigation, including, among other things, the FDIC Litigation described in Article III of this Disclosure Statement.  If the FDIC Litigation is determined adversely to the Debtors, substantially less funds will be available to be distributed under the Plan.  Additionally, certain litigation claims may not be covered entirely or at all by the Debtors' insurance policies, or their insurance carriers may seek to deny coverage.

**C.      Disclosure Statement Disclaimer**

> **1.      Information Contained Herein Is for Soliciting Votes**

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

> **2.      This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission**

This Disclosure Statement was not filed with the Securities Exchange Commission under the Securities Exchange Act of 1934 and Securities and Exchange Commission Rules or applicable state securities laws.  Neither the Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

US2008 2227176.11

### 3. Reliance on Exemptions from Registration Under the Securities Act

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar laws. To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Exchange Act of 1934 and Securities and Exchange Commission Rules and other applicable non-bankruptcy law, the issuance of securities held by a broker will be exempt from registration under the Securities Exchange Act of 1934 and Securities and Exchange Commission Rules by virtue of section 1145 of the Bankruptcy Code, section 4(2) of the United States Securities Exchange Act of 1934 or Regulation D promulgated thereunder, Rule 701 of the Securities Exchange Act of 1934 or a "no sale" under the Securities Exchange Act of 1934 as described herein.

### 4. No Legal Advice is being provided in this Disclosure Statement

**This Disclosure Statement is not legal advice to you.**  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan, or object to confirmation of the Plan.

### 5. No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors and the Committee) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

95

6.      **Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Plan Administrator may seek to investigate, file, and prosecute objections to Claims and Interests and may object to Claims after the confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to such Claims.

7.      **No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims, Causes of Action, or rights of the Debtors or Liquidating BankUnited (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims, Causes of Action of the Debtors, their Estates, or Liquidating BankUnited are specifically or generally identified herein.

8.      **Information Was Provided by the Debtors and Was Relied Upon by the Committee's Professionals**

In connection with the preparation of this Disclosure Statement, the Professionals for the Committee have relied upon information filed by or otherwise provided by the Debtors. Although the Committee's Professionals have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

US2008 2227176.11

9.      **Potential Exists for Inaccuracies, and the Committee Has No Duty to Update**

The statements contained in this Disclosure Statement are made by the Committee as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.  While the Committee has used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Committee nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Committee may subsequently update the information in this Disclosure Statement, the Committee has no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

10.      **No Representations Outside this Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, these Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors, counsel to the Committee, and the U.S. Trustee.

D.      **Liquidation Under Chapter 7**

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation

US2008 2227176.11

would have on the recoveries of Holders of Claims and the liquidation analysis is set forth in Article V herein, "Statutory Requirements for Confirmation of the Plan" and the Liquidation Analysis attached hereto as Exhibit B.

## VII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following is a summary of certain United States federal income tax consequences of the Plan to the Debtors and certain Holders of Claims and Interests.  This summary is based on the Internal Revenue Code, Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Committee does not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to Holders of Claims or Interests that are not "United States persons" (as such term is defined in the Internal Revenue Code) or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through Entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, and regulated investment companies).  The following discussion assumes that Holders of Claims or Interests hold such Claims or Interests as "capital assets" within the meaning of section 1221 of the Internal Revenue Code.  Moreover, this summary does not purport to cover all aspects of United States federal income taxation that may apply to the Debtors and Holders of Claims and Interests based upon their particular circumstances.

98

Additionally, this summary does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, or foreign tax law.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

**IRS  CIRCULAR  230  DISCLOSURE**:    TO  ENSURE  COMPLIANCE  WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE  OF  AVOIDING  TAX-RELATED  PENALTIES  UNDER  THE  INTERNAL REVENUE CODE.  TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE MARKETING OR PROMOTION  OF  THE  TRANSACTIONS  OR  MATTERS  ADDRESSED  BY  THIS DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.    **Certain United States Federal Income Tax Consequences to the Holders of Allowed Claims**

1.    **Consequences to Holders of Administrative Claims**

Pursuant to the Plan, Holders of Administrative Claims will receive payment in full in Cash on or as soon as practicable after the Effective Date.  A Holder that receives Cash in exchange for its Claim pursuant to the Plan generally will recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the amount of Cash received in exchange for its Claim and (b) the Holder's adjusted tax basis in its Claim. Such gain or loss should be capital in nature (subject to the "accrued interest" and "market discount" rules described below) and should be long term capital gain or loss if the Claim was held for more than one year by the Holder.

### 2. Consequences to Holders of Secured Claims

Pursuant to the Plan, each Secured Claim will either be paid in full in Cash, will receive the collateral securing the Claim, plus post-petition interest, or will otherwise be rendered Unimpaired for the benefit of the Holder thereof.  A Holder of a Secured Claim that receives Cash or collateral plus interest in exchange for its Claim pursuant to the Plan generally will recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the amount of Cash or the value of collateral plus interest received in exchange for its Claim and (b) the Holder's adjusted tax basis in its Claim.  Such gain or loss should be capital in nature (subject to the "accrued interest" and "market discount" rules described below) and should be long term capital gain or loss if the Claim was held for more than one year by the Holder.

### 3. Consequences to Holders of Non-FDIC Priority Claims

Pursuant to the Plan, each Non-FDIC Priority Claim will be paid in full in Cash on or as soon as practicable after the Effective Date. A Holder of a Non-FDIC Priority Claim that receives Cash in exchange for its Claim pursuant to the Plan generally will recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the amount of Cash received in exchange for its Claim and (b) the Holder's adjusted tax basis in its Claim. Such gain or loss should be capital in nature (subject to the "accrued interest" and "market discount" rules described below) and should be long term capital gain or loss if the Claim was held for more than one year by the Holder.

### 4. Consequences to Holders of Unsecured Claims

Pursuant to the Plan, Liquidating BankUnited will remain in existence after the Effective Date.  On or after the Effective Date, the Plan Administrator will make Distributions in accordance with the Plan.  Holders of Unsecured Claims will receive a Pro Rata Distribution of

100

the Residual Net Free Cash in satisfaction of their Claims.  A holder of an Unsecured Claim that receives Cash in exchange for its Claim pursuant to the Plan generally will recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the amount of Cash received in exchange for its Claim, and (b) the Holder's adjusted tax basis in its Claim.  Such gain or loss should be capital in nature (subject to the "accrued interest" and "market discount" rules described below) and should be long-term capital gain or loss if the Claim was held for more than one year by the Holder.

     **5.**       **Consequences to Holders of Interests**

Pursuant to the Plan, each Interest will be cancelled without distribution. A Holder of such an Interest may be entitled in the year of cancellation (or in an earlier year) to a worthless stock deduction in some amount under section 165(g) of the Internal Revenue Code to the extent of such Holder's tax basis in the Interest. The rules governing the timing and amount of worthless stock deductions place considerable emphasis on the facts and circumstances of the Holder, the issuer, and the instrument with respect to which a deduction is claimed.  Holders of Interests therefore are urged to consult their own tax advisors with respect to their ability to take such a deduction.

     **6.**       **Accrued Interest**

To the extent that any amount received by a Holder of a Claim under the Plan is attributable to accrued interest, such amount should be taxable to the Holder as interest income. Conversely, a Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a Claim will be attributable to accrued interest on the debts constituting the Claim is unclear. Treasury regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Pursuant to the Plan, all distributions in respect of any Claim will be allocated first to the principal amount of such Claim, to the extent otherwise permitted and as determined for federal income tax purposes, and thereafter to the remaining portion of such Claim, if any.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

### 7.    Market Discount

Under the "market discount" provisions of sections 1276 through 1278 of the Internal Revenue Code, some or all of the gain realized by a Holder of a debt instrument constituting a Claim who exchanges the debt instrument for other property on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the surrendered Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

US2008 2227176.11

Any gain recognized by a Holder on the taxable disposition of surrendered debts (determined as described above) that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

### 8.    Information Reporting and Backup Withholding

In general, information reporting requirements may apply to Distributions or payments under the Plan.  Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to Distributions or payments made pursuant to the Plan unless that Holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided, however, that the required information is provided to the IRS.  Liquidating BankUnited will comply with all applicable reporting requirements of the IRS.

### B.    Certain United States Federal Income Tax Consequences to the Debtors and Liquidating BankUnited

### 1.    Cancellation of Debt Income

Under the Internal Revenue Code, a taxpayer generally recognizes gross income to the extent that indebtedness of the taxpayer is cancelled for less than the amount owed by the taxpayer, subject to certain judicial or statutory exceptions.  The most significant of these

exceptions with respect to the Debtors is that taxpayers who are operating under the jurisdiction of a federal bankruptcy court are not required to recognize such income. In that case, however, the taxpayer must reduce its tax attributes, such as its net operating losses, general business credits, capital loss carryforwards, and tax basis in assets, by the amount of the cancellation of debt income ("CODI") avoided. In this case, it is expected that the Debtors will recognize significant CODI from the implementation of the Plan. As a result, it is anticipated that Liquidating BankUnited's NOLs will be reduced on account of such CODI.

### 2.    Limitation on NOLs

Under Section 382 of the Internal Revenue Code, any corporation that undergoes an "ownership change" within the meaning of Section 382 becomes subject to an annual limitation on its ability to utilize its NOLs and "built-in losses" in its assets. A corporation has a built-in loss in its assets to the extent that the corporation's tax basis in its assets is greater than the value of such assets.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF INTERESTS IN OR CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

US2008 2227176.11

## VIII.  PLAN SUPPLEMENT

The Plan Supplement will be filed with the Bankruptcy Court no later than five business days prior to the Plan objection deadline.  The Plan Supplement will include, among other things, (1) the Plan Administrator Agreement; (2) a list of the executory contracts and unexpired leases, if any, to be assumed or rejected pursuant to the Plan; (3) a list of Causes of Action; and (4) the charters of each of the entities comprising Liquidating BankUnited.  The Committee reserves the right to modify the Plan Supplement through and including the Effective Date.

## IX.      CONCLUSION AND RECOMMENDATION

The Committee believes that its Plan is in the best interest of Holders of all Claims and urges all Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their ballots, as applicable, so that they will be received by the Voting Agent by the voting deadline.

Dated:  April 11, 2011

Respectfully submitted,

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF BANKUNITED FINANCIAL
CORPORATION, ET AL.

US2008 2227176.11